# EXHIBIT 3


```
 1              UNITED STATES OF AMERICA
            DEPARTMENT OF VETERANS AFFAIRS
 2          OFFICE OF RESOLUTION MANAGEMENT
                 BAY PINES, FLORIDA
 3
 4     - - - - - - - - - - - - - - - - - - - - - - - - -
       LARRY D. THOMAS,              \
 5          Complainant,
 6              vs.
                              Case No.
 7                            200I-0619-2004102917
 8     CENTRAL ALABAMA VETERANS
       HEALTH CARE SYSTEM,
 9     WEST CAMPUS,
            Respondent.          /
10     - - - - - - - - - - - - - - - - - - - - - - - - -
11
                     TELEPHONIC
12        SWORN STATEMENT OF SAUNDRAH VENNE
13                  Wednesday - October 27, 2004
                    11:00 a.m. - 11:20 a.m.
14
15
16
       APPEARANCES:
17     DEPARTMENT OF VETERANS AFFAIRS
       OFFICE OF RESOLUTION MANAGEMENT
18     Ten Thousand Bay Pines Boulevard
       Building 37  Room 112
19     Bay Pines, Florida  33708
       BY:  WINSTON JOHNSON
20          EEO SPECIALIST
21
22
```

DEFENDANT'S
EXHIBIT
3

1

```
 1                P-R-O-C-E-E-D-I-N-G-S

 2                              11:00 a.m.

 3        The sworn statement of SAUNDRAH

 4   VENNE, witness, was taken before me, KATHRYN

 5   L. LILLY, Notary Public, State of North Carolina,

 6   pursuant to said Notice in said cause for the

 7   taking of said sworn statement.

 8                     *   *   *

 9            INVESTIGATOR JOHNSON:  Do you

10   solemnly swear or affirm that the information

11   that you are about to give is true and complete

12   to the best of your knowledge and belief?

13            THE WITNESS:  Yes, I do.

14   Whereupon,

15                 SAUNDRAH VENNE

16   a witness, called for examination, after having

17   been first duly sworn or affirmed, was examined

18   and testified as follows:

19                 EXAMINATION

20        BY INVESTIGATOR JOHNSON:

21        Q.  For the record, my name is Winston

22   Johnson, EEO investigator, and I'm taking the
```

1700 Pennsylvania Avenue, N.W.          JABS REPORTING, INC.          (202) 296-6102
Washington, D.C.  20006               www.jabsreporting.com          (888) 805-5227

```
 1    telephonic affidavit for the complaint of Larry

 2    D. Thomas against the Central Alabama Veterans

 3    Health Care System, West Campus, Case Number

 4    200I-0619-2004102917.

 5                Would you state for the record your

 6    name and spell it, please?

 7          A.   Saundrah Venne, S-A-U-N-D-R-A-H,

 8    V-E-N-N-E.

 9          Q.   You have the right to have a

10    representative present.   Do you have a

11    representative?

12          A.   No.

13          Q.   Would you like to proceed without

14    one?

15          A.   Yes.

16          Q.   Where are you employed?

17          A.   CAVHCS, Central Alabama Veterans

18    Health Care System.

19          Q.   How Long have you been employed at

20    this facility?

21          A.   At this facility I have been

22    employed since 1999.
```

3

1          Q.   What is your title and grade?

2          A.   I'm a Systems Manager for Vista

3    Imaging, GS-12.

4          Q.   Who is your first line supervisor?

5          A.   Joey Wilkes.

6          Q.   Who is your second level supervisor?

7          A.   I guess that would be Brad Stephens.

8          Q.   This investigation will focus on the

9    claim accepted for investigation.  I will read

10   the claim into the record before you respond to

11   it.  Claim, termination during probationary

12   period, whether on the basis of race (black) the

13   Complainant was discriminated against when on or

14   about May 14, 2004, Chief Information Officer,

15   William Greer, informed him at the end of the

16   workday his employment as the Vista Imaging

17   implementation Manager, GS-12, would be

18   terminated during his probationary period for

19   failure to successfully perform the duties of

20   the position.

21          Since this complaint is based on the

22   Complainant's race, please identify your race?

4

1          A.   Asian.

2          Q.   Do you know the Complainant?

3          A.   Yes.

4          Q.   How do you know the Complainant?

5          A.   We worked together.  We were

6    supposed to work together jointly on this

7    project.

8          Q.   Did you have a role in the selection

9    process when the Complainant was hired?

10         A.   No.

11         Q.   In a memo dated June 17, 2004, Mr.

12   William Greer, Chief Information Officer,

13   identified several factors that the

14   Complainant's termination was based upon.  Mr.

15   Greer stated that the Complainant superseded the

16   direction of the VISN initiative and his

17   interpersonal communication did not promote good

18   will.

19         Could you comment on this assessment

20   of the Complainant's performance?

21         A.   Can I ask for clarification?

22         Q.   Yes.

1700 Pennsylvania Avenue, N.W.          JABS REPORTING, INC.          (202) 296-6102
Washington, D.C. 20006                www.jabsreporting.com          (888) 805-5227

1          A.   Is that like when he doesn't talk to

2    me and stuff like that and he does things on his

3    own?

4          Q.   Interpersonal communication, yes.

5          A.   There was like almost none between

6    us.

7          Q.   Did he follow the direction of the

8    VISN initiative, do you know anything about

9    that?

10         A.   No, he did not, because the VISN had

11   said this is what we need to do, and he started

12   doing his own thing.

13         Q.   The Complainant challenged Mr.

14   Greer's statement that his communication does

15   not promote good will.  He claims he had a

16   pretty good rapport with everybody, including

17   service chiefs, managers and supervisors.

18              Could you comment on the

19   Complainant's assessment of his communication?

20         A.   Well, his communication, he didn't

21   communicate with myself, which is the System

22   Manager for Vista Imaging.  With him making

6

1    promises to service chiefs and then the service

2    chiefs coming to me is wrong.  He should have

3    came to me before he went to the service chiefs

4    to see if what he was wanting to implement would

5    have been feasible.

6        Q.  Mr. Greer stated the Complainant's

7    lack of understanding of organization, internal

8    process and committee structure.  Could you

9    comment on this assessment in regard to the

10   Complainant's understanding of these processes

11   and structures?

12       A.  I don't think he even understood the

13   process to tell you the truth.  He would go out

14   on his own and make decisions on his own and not

15   involve anyone in IRM, and when it came time for

16   an implementation where you had promised an

17   implementation date, no one else knew about it

18   and we were trying to play catch up on what he

19   had done.  Again, there's no communication.  He

20   never used our chain of command.  It just caused

21   a lot of problems inside the whole hospital.

22       Q.  In addition, the Complainant stated

7

1    the system was not ready for implementation

2    which was the system manager's responsibility,

3    but it reflected upon him.  Can you comment on

4    this assessment?

5        A.  Sure.  When he arrived on site the

6    TSO Team had not arrived.  It was ready for

7    implementation as far as all the equipment had

8    been set up, all the equipment had been checked.

9    The TSO Team does the install.  And that was our

10   training session.  It was ready and it was one

11   of the easiest installs that the TSO Team has

12   ever done.  They even commented on it.

13       Q.  Mr. Greer stated that the

14   Complainant's training and documentation was of

15   such poor quality that the training sessions had

16   to be presented to IT staff members for review

17   prior to client presentation.

18           Can you comment on this assessment

19   of the Complainant's lack of training expertise?

20       A.  I actually have no information on

21   that.  I have never seen any of his training

22   sessions.

8

1          Q.  The Complainant testified that he

2     was the best qualified trainer on the staff in

3     regard to Microsoft and Vista Imaging training.

4     Could you comment on his expertise as a trainer?

5          A.  I'm trying to think how I'm going to

6     put this.  As far as training for Microsoft, he

7     could barely use Microsoft.  He did not know how

8     to use spell check or the thesaurus.  He did not

9     know how to set up his own personal views in

10    Outlook.  He even had trouble browsing for a

11    Microsoft document.

12              As far as Vista Imaging, no, because

13    I did training as well, and I'm not sure why he

14    trained for two hours, but most of the Vista

15    Imaging training should not take more than half

16    an hour.  He did not know the system.  He did

17    not understand how it worked.  I don't see how

18    you can train something you don't understand.

19         Q.  Mr. Greer stated that the

20    Complainant's written composition was of such

21    poor quality that the clinical team leader

22    needed to review electronic messages for

9

1    accurate professional content prior to

2    electronic mailing.

3            Can you comment on this assessment

4    of his written communication?

5        A.  Yes.  His spelling was really

6    atrocious.  His English skills were almost

7    non-existent.  His e-mail messages were really

8    poor quality.  I've actually seen better

9    compositions done by junior high students.  He

10   did not know how to use the spell check.  He did

11   not know how to use a thesaurus.  His grammar

12   was just really terrible.  I've actually got

13   some of those e-mails and they were bad, you

14   couldn't understand them.

15       Q.  Have you had the opportunity to

16   review other written documents generated by the

17   Complainant?

18       A.  I don't think he wrote any that I

19   know of, so I would have no information on that.

20       Q.  Mr. Greer alleged a security

21   violation when the Complainant allowed his son

22   to use a government laptop to install Kazaa, a

10

1    file sharing program.  Do you have relevant

2    knowledge related to this alleged security

3    violation?

4         A.  I have no knowledge of that one.

5         Q.  Mr. Greer stated that the

6    Complainant's method of communication did not

7    always promote good will and often alienated

8    their clients and managers.  Could you comment

9    on this, his method of communication with

10   managers and other clients?

11        A.  He would go to the clients, which is

12   our different departments, and then tell

13   everyone how bad IRM was and that he should be

14   running IRM.  Yes, I do know that because they

15   have told me this.

16        Q.  The Complainant testified that he

17   only had a problem with one manager when the

18   manager e-mailed a supervisor about a concern

19   prior to giving him the opportunity to resolve

20   it.  He said he worked well with other managers.

21   Did he work well with most of the managers?

22        A.  I didn't realize he worked with any

11

1    managers other than his own immediate

2    supervisors.

3              Q.  Managers and service chiefs?

4              A.  I would not know really.

5              Q.  Mr. Greer stated that based upon the

6    Complainant's lack of clinical background he

7    could not obtain a grasp on clinical needs,

8    roles and responsibilities.  Can you comment on

9    the assessment of the Complainant's lack of

10   awareness in regard to clinical needs?

11             A.  Yes.  He doesn't have a clinical

12   background, but he could have grasped it by

13   getting the manuals and reading them or even

14   talking to the people about what they were doing

15   and what they needed instead of telling them

16   what they wanted and what they needed.

17             Q.  How would you describe the

18   Complainant's interactions with the female staff

19   members?

20             A.  I'm actually one of them that filed

21   a complaint against him.

22             Q.  Share that with me.

12

```
 1          A.  I filed a complaint.  We did an
 2   agreement -- what is it?  You talk it out.
 3          Q.  Mediation?
 4          A.  Yes, a mediation.  He's very forward
 5   with females.  He's just a bad person.  He
 6   doesn't like women who might have something to
 7   say is my perception of it, so he does things
 8   that he knows they are not going to like, like
 9   touching them when he's not supposed to.  He's
10   kind of gross.
11          Q.  Were there any allegations of
12   inappropriate conduct besides your complaint?
13          A.  Oh, yeah.  There's been others he's
14   been asked not to even go near.
15          Q.  How would you characterize your work
16   relationship with the Complainant?
17          A.  It started out great.  It did.  It
18   started out really well.  I tried so hard to
19   help him.  After three months of trying hard to
20   help him and him telling me how stupid I was, I
21   decided that's fine, let him learn on his own.
22   It just really deteriorated to the point where
```

13

1    he was off in his own little world and doing his

2    own little thing and I just spent my time trying

3    to clean up after it.

4        **Q.  How important was it for the**

5    **implementation manager and the system manager to**

6    **work together to complete this project?**

7        A.  It was very important because they

8    have to work hand in hand.  They have to work

9    together.  You have to know the whole aspect of

10   everything in order to keep it running.  You

11   have to know how all of the images interacted

12   and came to our system, you had to know how it

13   talked to our system, you had to know how the

14   whole thing talked to Vista.  And in order to

15   train it you had to understand how all of this

16   stuff works.

17        One person cannot do all of it is

18   what it amounts to, but two people can do almost

19   all of it and keep it running smoothly.  It's

20   not a one person job and each person going off

21   in their own little different directions, that

22   only tears the system apart rather than making

14

1    it work together.  As an implementation manager

2    you are supposed to go out and review.

3              According to national these are the

4    different types of instruments that we can

5    implement into our system because this is an FDA

6    approved system, but only these FDA approved

7    devices can attach to our system and this is how

8    it's going to attach and this is what needs to

9    be done.  He works with the system manager on

10   that because the system manager is the person

11   who has to make sure it works and talks to Vista

12   and Vista Imaging.

13        Q.  And how did your work relationship

14   affect the completion of the project?

15        A.  It put it back probably about three

16   to four months.  We're still catching up.

17        Q.  The Complainant testified that he

18   was interviewed telephonically for the position,

19   and the interview panel assumed that he was

20   white based on his diction.  He stated that the

21   staff members were shocked when they realized he

22   was a black person.

15

1              Could you comment on that

2    assumption?

3          A.   No, I can't.  I wasn't part of that

4    board or privy to that type of information.

5          Q.   Have you heard anyone mention

6    anything like this?

7          A.   No, sir.

8          Q.   The Complainant states shortly after

9    the six-month evaluation Mr. Greer requested the

10   Complainant provide copies of his training

11   certificates.  Do you have relevant knowledge

12   related to this request?

13         A.   Only the fact that Mr. Thomas kept

14   telling us that he was a Microsoft certified

15   engineer, but he sure had a hard time using

16   Microsoft products.

17         Q.   The Complainant stated he could not

18   get approval for overtime.  Do you have relevant

19   knowledge related to this alleged denial?

20         A.   No one gets approved for overtime

21   here, unless you're on call and only when you

22   get called back.

16

1         Q.  Do you have any reason to believe

2    that the Complainant's termination during his

3    probationary period was influenced by his race?

4         A.  No.

5         Q.  Do you have any additional

6    information that you would like to add regarding

7    the claims that you have not already shared with

8    we, something that I may have missed that would

9    clarify this issue, add clarity to this issue?

10        A.  I don't think so.  I think I was

11   pretty vocal on that.  I do get upset sometimes

12   when -- it's just that he should have taken more

13   time to learn about the system.

14        Q.  I would like to ask you at this

15   time, would you like a copy of your transcript?

16        A.  Yes, I would, please.

17        Q.  These are the guidelines that you

18   must follow.  The witness may not make any marks

19   on the transcript itself, but that all

20   corrections should be made on an errata sheet

21   that will be provided with the transcript.  Any

22   changes to the original transcript will not be

17

1    included into the investigative file.

2                    The signed transcript and correction

3    sheet are to be returned by mail to the

4    investigator within seven calendar days of

5    receipt.  If the signed transcript and

6    correction sheet are not returned to the

7    investigator within seven calendar days, it will

8    be deemed that the witness has elected to waive

9    her right to review, correct and sign.

10                    Witnesses will be encouraged to keep

11   a copy of the errata sheet and transcript.  The

12   witness may not make substantive changes to the

13   transcript.

14                    Ms. Venne, I am going to mail this

15   to you Fed Ex so I would like for you to provide

16   an address and a telephone number where you

17   would prefer to receive your transcript.

18           A.   Go ahead and send it to my home

19   address at ▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮ ▮▮▮▮▮

20   ▮▮▮▮.

21           Q.   And the telephone number?

22           A.   You probably ought to call me at

18

1    work, and that's (334)272-4670, extension 4299.

2        Q.   What would be to best time for

3    delivery?

4        A.   After 5:00.

5             INVESTIGATOR JOHNSON:   This ends

6    your sworn statement, and I want to thank you

7    for your time and your cooperation.

8                     *  *  *  *

9             (Thereupon, at approximately 11:20

10   a.m. the above proceeding was adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

                                                    19

1          CERTIFICATE OF NOTARY PUBLIC

2              STATE OF NORTH CAROLINA

3          I, Kathryn L. Lilly, a Notary Public in

4     and for the State of North Carolina, before

5     whom the foregoing cause was taken, do hereby

6     certify that the witness whose testimony appears

7     in the foregoing transcript was taken by me

8     in shorthand at the time mentioned in the

9     caption hereof and thereafter transcribed by me;

10    that said transcript is a record of the

11    testimony given by said witness to the best of

12    my ability; that I am neither counsel for,

13    related to, nor employed by any parties to the

14    action; and further, that I am not a relative or

15    employee of any counsel or attorney employed by

16    the parties hereto, nor financially or otherwise

17    interested in the outcome of this action.

18

19    _____
                 NOTARY PUBLIC

20

21    My Commission Expires:
      July 27, 2008

22

```
 1              DEPARTMENT OF VETERANS AFFAIRS
            OFFICE OF RESOLUTION MANAGEMENT
 2                   BAY PINES, FLORIDA
 3
      - - - - - - - - - - - - - - - - - - - - - - - - - -
 4    LARRY D. THOMAS,            \
             Complainant,
 5
                vs.
 6                                  Case No.
                                    200I-0619-2004102917
 7
      CENTRAL ALABAMA VETERANS
 8    HEALTH CARE SYSTEM,
      WEST CAMPUS,
 9             Respondent.         /
      - - - - - - - - - - - - - - - - - - - - - - - - - -
10
11              ACKNOWLEDGMENT OF DEPONENT
12              I, Saundrah Venne, do hereby acknowledge
      that I have read and examined pages 2 through 19,
13    inclusive, of the transcript of my deposition
      taken on Wednesday, October 27, 2004, and that:
14
      (Check appropriate box)
15
      [ ] the same is a true, correct, and complete
16    transcription of the answers given by me to the
      questions therein recorded.
17
      [ ] except for the changes noted in the attached
18    Errata sheet, the same is a true, correct, and
      complete transcription of the answers given by me
19    to the questions therein recorded.
20
21    _____          _____
         Date                          Signature
22
```

                                                        21

1                              ERRATA SHEET

2       Page and line number           Correction or change

        as reported:                   and reason

3       therefor:

4

5       _____          _____

6       _____          _____

7       _____          _____

8       _____          _____

9       _____          _____

10      _____          _____

11      _____          _____

12      _____          _____

13      _____          _____

14      _____          _____

15      _____          _____

16      _____          _____

17      _____          _____

18      _____          _____

19      _____          _____

20      _____          _____

21      _____          _____

22      _____          _____

                                                              22

November 3, 2004

Ms. Saundrah Venne
~~████████████~~
~~████████~~

RE:    Larry D. Thomas – Discrimination Complaint
       Agency Case No. 200I-0619-2004102917

Dear Ms. Venne:

The transcript of your testimony is enclosed.  If after reviewing it, you find it necessary to make corrections, please type them on the attached correction sheet.  You may not make any changes that would alter the substance of your testimony.   You may attach additional sheets, as necessary.  Please initial any additional sheets.  You may **not write on the original transcript.**  Any changes made on the original transcript will not be included in the investigative file.

When you have completed the correction sheet and signed the transcript, you should return both to me at Department of Veterans Affairs, ORM Field Office (08J), P.O. Box 5005, Bay Pines, FL 33744, before the close of business on November 12, 2004.

If you do not return the correction sheet and signed transcript by this date, you will be deemed to have waived your right to review correct and sign the transcript; and the original transcript will be included in the investigative record as is.

Thank you for your prompt attention to this matter.  Please call me at (727) 319-1171, if you have any questions.

Sincerely yours,

Winston Johnson
EEO Investigator

Enclosure: Transcript

From:   Origin ID:   (727)319-1171
Winston Johnson
Dept of Veterans Affairs
Resolution Management (08J)
10000 Bay Pines Blvd.
St. Petersburg, FL 33708



Ship Date: 03NOV04
Actual Wgt: 1 LB
System#: 2453096/INET2000
Account#: S *********

REF:



Delivery Address Bar Code

SHIP TO:                    BILL SENDER



CL30914040506

** 2DAY **                                    **FRI**

TRK#   **7908 1926 0719**    FORM
0201

                                              Deliver By:
                                              05NOV04

                              **BHM**    PM

**36025**   -AL-US

**SJ MGMA**



**Shipping Label: Your shipment is complete**

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.