# EXHIBIT 4

```
 1                  UNITED STATES OF AMERICA
              DEPARTMENT OF VETERANS AFFAIRS
 2            OFFICE OF RESOLUTION MANAGEMENT
                   BAY PINES, FLORIDA
 3
 4    LARRY D. THOMAS,
                 COMPLAINANT,
 5
      V.                        Case No. 200I-0619
 6              .                        2004102917
 7    CENTRAL ALABAMA VETERANS
      HEALTHCARE SYSTEM,
 8              RESPONDENT.
 9    _____/
10
                 SWORN STATEMENT OF TY BEASLEY
11
                      Thursday - October 21, 2004
12                    3:00 p.m. - 3:48 p.m.
13
14
15
16
17
18
      APPEARANCES:
19    DEPARTMENT OF VETERANS AFFAIRS
      OFFICE OF RESOLUTION MANAGEMENT
20    Ten Thousand Bay Pines Boulevard
      Building 37, Room 112
21    Bay Pines, Florida  33708
      BY:    WINSTON JOHNSON
22           EEO SPECIALIST
```

DEFENDANT'S
EXHIBIT
**4**

1                          TY BEASLEY,

2    A witness, called for examination, after being duly

3    sworn or affirmed, was examined and testified as

4    follows:

5                          EXAMINATION

6                   BY INVESTIGATOR JOHNSON:

7              Q.   For the record, my name is Winston

8    Johnson, EEO Investigator, taking a telephonic

9    affidavit for the complaint of Larry D. Thomas

10   against the Central Alabama Veterans Healthcare

11   System, West Campus, Case Number

12   200I-0619-2004102917.

13                   Would you state for the record your

14   name and spell it, please.

15             A.   My name is Ty Beasley, T-Y is the

16   first name, and the last name is B-E-A-S-L-E-Y.

17             Q.   You have the right to have a

18   representative present, do you have a

19   representative?

20             A.   No, Sir, I do not.

21             Q.   Would you like to proceed without

22   one?

2

1         A.    Yes.

2         Q.    Where are you employed?

3         A.    I am employed at the VA Central

4    Alabama Healthcare System in Montgomery, Alabama.

5         Q.    And how long have you been employed

6    at this facility?

7         A.    Well, my most recent position has

8    been a little less than two years.

9         Q.    And what is your title and grade?

10        A.    My title is the Pharmacy Program

11   Specialist.  I do lead the Clinical Informatics

12   Team, but if you're asking what my personnel title

13   is, it's Pharmacist Programs Specialist.  But the

14   activity, the leadership I provide, it's the

15   Clinical Informatics Team Leader, and my grade is

16   GS-13.

17        Q.    And who is your first-level

18   supervisor?

19        A.    My first-level supervisor is William

20   Greer.  He's the CIO of Central Alabama Healthcare

21   System.

22        Q.    This investigation will focus on the

3

```
 1    claim accepted for investigation.  I will read the

 2    claim into the record before you respond to it.

 3    Claim, termination during probationary period.

 4    Whether on the basis of race (black), the

 5    Complainant was discriminated against when on or

 6    about May 14, 2004, the Chief Information Officer,

 7    William Greer, informed him that at the end of the

 8    workday, his employment as the VistA Imaging

 9    Implementation Manager, GS-12, would be terminated

10    during his probationary period for failure to

11    successfully perform the duties of the position.

12    Since this complaint is based on the Complainant's

13    race, what is your race?

14              A.    Caucasian.

15              Q.    Do you know the Complainant?

16              A.    Yes, I do.

17              Q.    How do you know the Complainant?

18              A.    I became acquainted with him as an

19    employee in Central Alabama, that's when I first

20    met him.

21              Q.    And what role did he play on the

22    Information Technology Team?
```

4

1          A.    The position he was hired to was, as

2    you're already documented, was as the VistA Imaging

3    Implementation Manager.  That position -- did you

4    want me to elaborate on what the position is, or --

5          Q.    **No, you won't need to do that.**

6          A.    Okay.

7          Q.    **Did you have a role in the selection**

8    **process for when the Complainant was hired?**

9          A.    I actually was on the interview team

10   when the interviews were conducted to fill that

11   position.  And in so doing, we what did was use a

12   performance-based interview process, and each of

13   the interviewers, you know, graded each applicant,

14   and that information was sent to the CIO, the

15   Acting CIO at that time, for selection.

16         Q.    **And who was the Acting CIO at the**

17   **time?**

18         A.    Harald Carlisle.

19         Q.    **In a memo dated June 17, 2004,**

20   **William Greer, Chief Information Officer,**

21   **identified factors the Complainant's termination**

22   **was based upon.  Mr. Greer stated the Complainant**

5

1    **superceded the directions of the VISN Initiative,**

2    **and his interpersonal communication did not promote**

3    **goodwill. Could you comment on this assessment of**

4    **the Complainant's performance?**

5    A. Larry, I guess, in my opinion, Larry

6    often had difficulty even from the beginning, in

7    trying to be the Implementation Manager and doing

8    the job that needed to be done. What was expected,

9    in my opinion, in this position, was to come in

10   with the skill-set necessary to effect the program

11   we were trying to implement, and get it implemented

12   in short order, successfully, to provide training

13   to endusers of various -- you know, some

14   clinicians, some not -- and to sustain the program

15   after it was implemented to the point where things

16   were going well.

17   It seemed that he was -- from the

18   very beginning and, I think, all the way through

19   the end of his employment, he was always struggling

20   to do that.

21   Q. The Complainant stated that the Chief

22   **of Staff asked him to develop a software package to**

6

1    help Primary Care expedite their processes.  The

2    Complainant stated he developed a demonstration

3    package for the service, but there wasn't any

4    funding to implement it.  Do you have knowledge of

5    this request?

6          A.    What did he call the request?

7          Q.    They requested him to develop a

8    software package where they could expedite certain

9    processes.  I think they was using

10   transcriptionists to produce, and they asked him to

11   create a software package that they could use to

12   expedite this process.

13         A.    I am not aware of that, but I have

14   some information that could be related, I guess.

15   At one time, Primary Care, which is one of our

16   service lines, was asking for assistance in how to

17   -- to look at some different solutions to

18   dictation, which would be voice recognition

19   software, that providers, the clinicians, could use

20   instead of typing their notes and things into the

21   computer.  I do know that Larry assisted them by

22   obtaining -- getting one of the vendors, I think it

7

1    was Dragon Dictate, D-R-A-G-O-N, Dictate Company,

2    to provide a web meeting, which we conducted from a

3    training room, and several of the key state coders

4    were there for that demo.  But that was just to --

5    his only function was to facilitate a demonstration

6    by the vendor, it wasn't to develop a software

7    application.

8              And at the time, the understanding

9    was is that once we facilitated the information

10   that they could get, it was up to the Primary Care

11   Service Line to try and proceed with trying to

12   purchase the product and implement it.  Does that

13   sufficiently answer your question?

14        Q.   Yes.

15        A.   Okay.

16        Q.   The Complainant challenged

17   Mr. Greer's statement that his communications did

18   not promote goodwill.  He claims he had a pretty

19   good rapport with everybody, including service

20   chiefs, managers, and supervisors.  Could you

21   comment on Complainant's assessment of his

22   communication with managers?

8

1          A.   Well, there was a few elements to

2    that, I think, in my opinion.  Verbal

3    communications and then, separately, written.  Let

4    me take verbal first.  You know, Larry was

5    encouraged, as Implementation Manager, to go out

6    and meet with clinical service leaders and managers

7    about the VistA Imaging Implementation and sit down

8    with them and discuss how they wanted training

9    done, develop training calendars, keeping them

10   informed.

11          What we heard -- and, you know, the

12   information that kind of came back by various

13   methods, was that he didn't communicate well with

14   the people, they didn't seem to take the

15   communications in a positive manner.  There were

16   times when I personally met with him and other

17   service managers just to make sure that things went

18   well.  It seemed that if there was any strain with

19   communications that I would be there to help out

20   with the discussion.  But often, you know, people

21   were either offended or said that the information

22   he was given them was inaccurate, based on their

9

1     own knowledge of policies and procedures, and it

2     just didn't seem often to be well-taken.  Now from

3     a written communications point of view --

4          Q.    And we're probably going to discuss

5     the written communication later.

6          A.    Okay.

7          Q.    The e-mails, and that type of stuff.

8     Mr. Greer stated the Complainant lacked

9     understanding of organizational internal processes

10    and community structures.  Would you comment on

11    this assessment in regard to Complainant's

12    understanding of these processes and structures.

13    Like committees and internal organizational

14    processes?

15         A.    Sure.  I -- you know, there were

16    times when I would spend time with Larry, I tried

17    to help facilitate his understanding of the VA

18    structure.  He, as well as many other employees,

19    including myself, were always recipients of

20    messages that came from our front office or our

21    senior leadership about organizational structure.

22    Many times these had attachments, had work charts,

10

1    so we could understand the changes in the

2    organization and who fulfilled certain positions,

3    so if you were looking for someone in a leadership

4    position, you knew to right person to go to.

5              He constantly struggled with that,

6    even when he was given directions by me, sometimes,

7    saying that these are the people you need to talk

8    to to get this done.  And I was doing that, really,

9    as in an advisory role, not as his supervisor, but

10   trying to help him.  And he didn't seem to get a

11   good grasp for organizational structure, and was

12   constantly, you know, going to the wrong people, or

13   inappropriate people to get certain things done.

14   So it often led to delays in getting things done,

15   and sometimes frustration on the behalf of the

16   users that were contacted when they shouldn't have

17   been.

18             Q.   The Complainant testified that he

19   requested to be on several different committees,

20   but Mr. Greer and Mr. Carlisle decided that he did

21   not need to be on these committees.  Do you have

22   any relevant knowledge related to these requests by

11

1    the Complainant?

2            A.    No, Sir, I don't.  I don't have any

3    information related to that.

4            Q.    The Complainant testified he Chaired

5    the VistA Imaging Project Committee, and scheduled

6    weekly meetings which were attended by Imaging

7    Personnel, and some individuals from the service

8    lines.  Could you comment on his leadership and

9    organizational leadership in this committee?

10           A.    Well, in my opinion -- because I

11   wasn't actively involved in that, I wasn't actively

12   involved in this Imaging Implementation, but I was

13   knowledgeable of his efforts to do that.

14                The two perspectives I got is that

15   there were times when others didn't participate

16   actively, but they were also times when Larry did

17   not participate actively.  So it was somewhat

18   discouraging to others, thinking that well, it must

19   not be that important if he's not here to conduct

20   the meeting.  So that's generally some of the

21   things I was hearing.  I don't know if it really

22   was that constructive or not.  I think the

12

1    intention was good, to get people together

2    face-to-face to discuss implementation issues, but

3    it didn't seem to go that well, so I don't think it

4    was successful.

5         **Q.   In addition, the Complainant stated**

6    **that the system was not ready for implementation,**

7    **which was the System Manager's responsibility, but**

8    **it reflected upon him.  Could you comment on this**

9    **assessment?**

10        A.   I think the system was ready to be

11   implemented, but it did require that someone come

12   in and roll up their sleeves and proactively engage

13   by teaching themselves, learning everything they

14   could, and reacting to requests.  I do know that we

15   had implementation managers that were external to

16   us, they were key to our implementation.  They

17   actually would come here and help set the

18   infrastructure up and get things going.  And from

19   my perspective, the systems side of it was fairly

20   uneventful.  As a matter of fact, I think one of

21   the National Implementation Managers was

22   complimentary of our System's Manager for having

13

1    made it a smooth transition.

2             What I do think was bumpy was the

3    actual implementation from a roll-out of the

4    application, which was primarily what Larry worked

5    with the Implementation Manager to do -- I mean,

6    the System's Manager, excuse me.  His role was

7    primarily to take -- technically what has been put

8    into place and help provide it to the clinicians,

9    train them, and get things running, from an enduser

10   perspective, so ultimately, the clinicians and the

11   other users that needed to view the images, could

12   do that with little effort.

13        **Q.   Mr. Greer stated the Complainant's**

14   **training and documentation were of such poor**

15   **quality, that the training sessions had to be**

16   **presented to IT staff members for review prior to**

17   **client presentation.  Could you comment on this**

18   **assessment of the Complainant's lack of training**

19   **expertise?**

20        A.   That, in fact, was necessary, because

21   the preliminary drafts of training material looked

22   to be incomplete.  Not very coherent, I guess, as

14

1    far as putting the ideas together.  So it did

2    require that we had internal analysis training

3    before it actually went realtime.  There were a lot

4    of errors in the spelling and in the sentence

5    structure and things like that, so I could

6    substantiate that that was necessary.

7            Q.    The Complainant testified that the

8    VISN provided him with two hours of training, which

9    Mr. Beasley, yourself, believed was not good enough

10   to train the medical staff.  You stated that you

11   suggested that they gather the available

12   information, develop a new package, and present it

13   to the IT Staff prior to presenting it to the

14   medical staff.  He stated that the training

15   demonstration for the IT Staff was a team effort to

16   improve the finished product.  Mr. Greer viewed the

17   exercise as the grading of the trainer.  Could you

18   comment on this training exercise?

19           A.    Well, I wouldn't agree fully with the

20   statements.  One thing about the training and the

21   length of it is that I don't recall ever going on

22   record or saying that I felt two hours was

15

1    inadequate.  You have different audiences and

2    different portions of VistA Imaging to train on,

3    it's not just one-size-fits-all for training.  The

4    most comprehensive part of the training could have

5    easily been done in two hours.

6              I think that there was a bit of

7    resentment between Larry and some of the VISN VistA

8    Imaging personnel that actually came here to

9    observe and evaluate our program about the length

10   of time.  They were very assertive about, you know,

11   it doesn't take that much time.  And to get

12   clinicians that are very busy individuals in for

13   training, you have to streamline your training, cut

14   it down and make it very specific and not very long

15   in duration.  And I do know that there was a very

16   significant difference between their opinion and

17   his opinion of how long the training needed to be.

18             But I didn't really have a strong

19   opinion about that.  I felt that that was something

20   that was more between him and the VISN, I wasn't

21   really in a role of telling him how long his

22   training should be or not.

16

```
1              Q.   The Complainant testified that he was

2    the best-qualified trainer on the staff in regards

3    to Microsoft and VistA Imaging training.  Could you

4    comment on the Complainant's assessment of his

5    expertise as a trainer?

6              A.   I wasn't real impressed with his

7    expertise as a trainer.  I do know that his

8    application package and all, he had lots of things

9    that he cited, certifications and all.  But it

10   didn't really fit, the qualifications didn't really

11   fit the real result that we saw, or at least what I

12   saw in my opinion.  So I think Larry was okay as a

13   trainer, but he certainly wasn't more qualified

14   than others on our staff by any measure.

15             Q.   In addition, the Complainant

16   testified that when he presented the training to

17   the medical staff to learn how to utilize the VistA

18   Imaging Program throughout the hospital, and it was

19   reflected in the training evaluation.  Could you

20   comment on the Complainant's assessment of the

21   implementation training that he give the staff?

22             A.   I wasn't present for a majority of
```

17

1    that, those trainings, so I really can't speak to

2    the quality of it.  As far as evaluations, I know

3    there were times when Larry cited that, you know, I

4    always get good evaluations, but I'm not sure our

5    evaluation process is that valid of a process.

6    Because when you conduct training, and you give

7    someone an evaluation form right after the

8    training, and say here, complete this, and they

9    hand it back to you, I think that individuals

10   sometimes are somewhat hesitant to be, you know,

11   honest about their true evaluation.  Some of the

12   clinicians, you know, they just want to get out of

13   there.

14            So if you give them the impression

15   that I need to complete the evaluation form and

16   leave, then people just rush through it, I don't

17   think they give it a lot of thought.  But I also

18   think it's somewhat uncomfortable to have to

19   complete an evaluation form in the presence of the

20   trainer.

21            Q.   Mr. Greer stated that the

22   Complainant's written composition was of such poor

18

1    quality, that the clinical team leaders needed to

2    review electronic messages for accurate

3    professional content prior to electronic mailing.

4    Could you comment on this assessment of the

5    Complainant's written communications?

6         A.    That is true, in my opinion.  I mean,

7    I picked up on it fairly soon as he began to

8    communicate with the staff.  His messages were

9    often very poorly constructed, often words were

10   misspelled, sentence structure was not good.  His

11   communication in general was not that good.  And I

12   did make efforts to give him feedback, constructive

13   feedback, saying before you send this out, you may

14   want to consider these changes or consider redoing

15   your letter or your e-mail.  That was not just not

16   one occasion, but several occasions.  And I think

17   it got to the point where, you know, we had to

18   request that nothing could go out until it was

19   actually reviewed.

20              Because people's perceptions were,

21   you know, when you get a message from a

22   professional, and it's not written well, people

19

1    draw conclusions like well, how qualified or how

2    educated, or whatever, is this individual if

3    they're writing this way?  So I think it did send

4    out a negative message letting the messages go out.

5    So we decided to do that, and I made a lot of

6    effort to help Larry with that.  We also offered to

7    tell him, you know, you need to seek out additional

8    training when you can.  Maybe consider college

9    courses, things like that, that could help him

10   improve his communication and writing skills.

11          **Q.    The Complainant conceded that e-mails**

12   **were often hurried to meet deadlines mandated by**

13   **Mr. Greer.  He stated that there were some errors,**

14   **but the message was clear.  Could you comment on**

15   **the Complainant's assessment of the message being**

16   **clear?**

17          A.    I don't think there were many times

18   when they were not clear at all, and it would have

19   been detrimental to send them out had they not been

20   reviewed and corrected before they were actually

21   distributed to an outside audience.  And I have

22   first-hand experience dealing with those kinds of

1700 Pennsylvania Avenue, N.W.        JABS REPORTING, INC.        (202) 296-6102
Washington, D.C. 20006              www.jabsreporting.com        (888) 805-5227

1    messages, so I'm not sure I understand what he

2    meant by being hurried.  A lot of people in high

3    positions have deadlines to meet and schedules,

4    that's part of the reason you're in those

5    positions, and you have a skill-set that can

6    accommodate reacting in short order to issues and

7    being able to communicate clearly with people.

8           **Q.    Have you had the opportunity to**

9    **review other written documents generated by the**

10   **Complainant, other than e-mails?**

11          A.   Yes, I reviewed some training

12   material, training documents that he used to issue

13   to people that he trained, e-mails, and that's

14   about all I can recall.  But that's generally the

15   way we communicate here, through e-mail.  I don't

16   remember if there were any document attachments

17   that I supplied.

18          **Q.    Describe the quality of the training**

19   **materials that --**

20          A.   They needed to be corrected before

21   they were ready for distribution to the trainees.

22   It was not -- you could tell that he used a lot of

21

1    things that came off of other training documents.

2    But then, the way it was kind of put together, you

3    know, it lacked a little bit of coherence.  Some of

4    the wording between screen captures and things like

5    that, he did get off of web sites that was not

6    correct, and had to be corrected from time to time.

7         Q.   Mr. Greer alleged a security

8    violation when the Complainant allowed his son to

9    use a government laptop to install sharing files.

10   Do you have relevant knowledge related to this

11   alleged security violation?

12        A.   No, Sir.  All I know is that I

13   assisted Larry in getting permission to use the

14   laptop, to get a laptop issued to him through the

15   VA, so he could use it for training purposes as he

16   moved across campuses and things like that.  But I

17   don't have any direct knowledge of the security

18   violation.

19        Q.   Mr. Greer stated that had the

20   Complainant's message that the communication did

21   not always promote goodwill, often alienated the

22   clients and managers.  Could you comment on this

22

1    **assessment of his method of communication?**

2            A.    Well, we talked some during this

3    interview about the fact that his communications

4    were not that good.  But as far as how they were

5    received, you know, you can only go by how people

6    respond.  And I will tell you that there were

7    several people in management and senior leadership

8    positions, they were either offended or didn't

9    appreciate the tone of the communication that was

10   sent to them, and made that known to us.  So, you

11   know, there were several, I think, over the period

12   of his employment that responded that way.

13           **Q.    The Complainant testified that he**

14   **only had a problem with one manager, William Piper.**

15   **Because Mr. Piper, he yelled at a supervisor about**

16   **a concern prior to giving the Complainant the**

17   **opportunity to resolve it between them.  He stated**

18   **he worked well with the other managers.  Do you**

19   **agree with that?**

20           A.    No I wouldn't.  Although Larry had

21   good intentions, but I don't think the other

22   managers' perception was that good of how well they

23

1     worked with him.  I do know that there was a level

2     of -- I don't know what you could call it,

3     friction, for example, between Mr. Piper and Larry.

4     But I think that's only because the importance of

5     the VistA Imaging personnel working with the

6     Biomedical Engineering personnel.  And the reason

7     that that was necessary is a lot of the medical

8     instruments were maintained by the Biomedical

9     Engineering Team, and many of those instruments

10    would interface or need to be interfaced.  So there

11    was a need to have a good working relationship with

12    that staff to be successful as the Implementation

13    Manager.  And I think the system's manager

14    maintained probably a better working relationship

15    with them than he did.

16         Q.    Mr. Greer stated based on the

17    Complainant's lack of clinical background, he could

18    not obtain a grasp of clinical needs, roles, and

19    responsibilities.  Could you comment on this

20    assessment of Complainant's lack of awareness in

21    regard to clinical needs?

22         A.    Yes, I think he lacked a perspective.

24

1    I don't think he had any experience in that area,

2    so I don't know if, you know, it just didn't seem

3    that he grasped the clinical environment that well

4    compared to a non-clinical environment.  You know,

5    there's a lot of clinical people, there's nurses --

6                (Discussion was held off the record.)

7                BY INVESTIGATOR JOHNSON:

8         Q.    **About the clinical awareness of the**

9    **-- in regard to clinical needs.**

10        A.    Okay, let me continue.  I don't think

11   Larry brought a background of working in a clinical

12   environment with him, and it was very difficult for

13   him to work in this new environment.  It often led

14   to misunderstandings, you know, about what the

15   clinical staff really needed in training, versus

16   what his perception was.  So I do think it was a

17   lack of clinical background, or working in the

18   clinical setting did add to his problems with

19   performing the job.

20        Q.    **Complainant testified that he worked**

21   **well with clinical side of the hospital, and**

22   **possessed a good understanding of their needs.**

25

1    **Could you comment on his assessment of his grasp of**

2    **clinical needs?**

3         A.    Well, I wouldn't agree.    In my

4    opinion, because we, you know, in order to balance

5    things -- then again, I think I know as an outsider

6    looking in, but I do know that our network, our

7    VISN, V-I-S-N, personnel would be asked to come to

8    evaluate how we were doing, and to make a site

9    visit.    And I do know that based on their site

10   visit and their assessment, there were often major

11   issues with their perception of how he was doing

12   the training, as opposed to what they felt that the

13   clinicians needed.    And there was a time when he

14   disagreed with them.    He said -- we have one doctor

15   from Dublin, I think, that actually was acutely

16   involved in the VistA Imaging Initiative across our

17   network, and came and worked with him.    And some

18   other clinicians actually sitting in on training

19   sessions tried to advise him, saying you need to

20   modify your training, you need to cut it down, you

21   need to streamline it.    And I think he was fairly

22   adamant to disagree with them.    So in that sense, I

26

1    think it hurt him.

2          Q.    How would you describe the

3    Complainant's interactions with the female staff

4    members?

5          A.    Well, in my opinion, there were times

6    when -- I never witnessed anything, myself, that

7    would be considered inappropriate or strained, as

8    far as --

9          Q.    Are you aware of any allegations of

10   inappropriate conduct?

11         A.    Yes, there were times when people

12   would contact us, or I have understood they had

13   contacted us about issues with interpersonal, I

14   guess, reactions with him, or interactions with

15   him.  You know, there were some fairly, I thought,

16   significant complaints.  But I would have no

17   knowledge of whether they were substantiated or

18   not.

19         Q.    What type of complaints?

20         A.    Sexual-type comments, or handling

21   himself in private parts of his body during

22   conversations or interactions with them.  You know,

27

1    just a general feeling they felt uncomfortable

2    because of, I guess, the type of interactions at

3    the time.  At one point, lingering in offices, not

4    taking care of whatever they came for and then

5    leaving, but staying around, trying to have

6    friendly talk and just, you know, probably being

7    too friendly, if I had to sum it up.

8         Q.   How would you characterize the

9    Complainant's working relationship with Ms. Venne,

10   the System's Manager, Ms. Saundrah Venne?

11        A.   Very strained, in my opinion.

12        Q.   The Complainant testified that he was

13   interviewed telephonically for the position.  The

14   interview panel assumed, based on his diction, that

15   he was white.  He stated that you were shocked when

16   you greeted him and realized he was black.  Could

17   you comment on this assumption?

18        A.   That's very untrue.  You know, we

19   don't interview based on color, race, or ethnicity,

20   or anything like that.  But I will tell you that --

21   honestly speaking, I will tell you I have grown up

22   in the South, and he did too, so it was fairly easy

28

1    for me to tell who I was talking to, but it didn't

2    bear any significance to what I was doing.  I

3    evaluate people based on the information that I

4    have in front of me, plus the answers that they

5    give to the questions.  And I was not shocked when

6    he came and presented himself.  I had never met the

7    man before, but believe me, I had a general

8    understanding that he was, you know, black.  And

9    really, I had no problem with that.  As a matter of

10   fact, I probably rated him pretty high on his

11   performance-based interview based on the

12   information that was given during the interview.

13   So I don't think that can be substantiated.

14          **Q.   The Complainant stated that shortly**

15   **after his six-month evaluation, Mr. Greer requested**

16   **the Complainant provide copies of his training**

17   **certificates.  Do you have relevant knowledge**

18   **related to this request?**

19          A.   I do know that Mr. Greer had asked

20   for documentation, simply because many things were

21   cited in his application, his official application,

22   that indicated that he had certification, like

29

1  Microsoft Certification and training, or

2  Microsoft-certified engineer -- you know, these

3  certifications generally require, you know, a good

4  bit of training and documentation.  And I guess the

5  thought was is that based on his performance, his

6  -- he seemed not to know much about a lot of the

7  Microsoft applications that he was so-called

8  certified in, which led, I guess, to some suspicion

9  that were the documents valid or not.  And I think

10  once they saw them and they were valid, then it was

11  a non issue.  But I think the reason that it was

12  required at the time was, you know, if you're a

13  Microsoft-certified professional, and you're having

14  difficulty using one of the Microsoft products that

15  you were certified in, I mean, you should be almost

16  an expert in that.  And many of them, he was

17  challenged, very challenged in trying to use those.

18       **Q.   The Complainant stated that he could**

19  **not get approval for overtime, do you have relevant**

20  **knowledge related to this alleged denial?**

21       A.   There were times when he did get

22  overtime.  But I think, due to our budgetary

30

1    constraints, not only he, but others, if they did

2    work over their tour, were offered comp-time to

3    make up for the extra time that they had placed in.

4    So, you know, at one time -- the overtime dollars

5    are very limited, and they felt that because they

6    were being consumed at a pretty high rate due to

7    special training, and it's just before work or

8    after work that were requested by the clinical

9    staff, that we had to shift to comp-time instead of

10    overtime.

11            But that was not just for him, it was

12    everyone, and the overtime dollars were spent on

13    the overtime staff that covered the hospital at

14    night, weekends, and holidays that work 24 hours

15    and were actually on call.

16        Q.    Do you have any reason to believe the

17    Complainant's termination during his probationary

18    period was influenced by his race?

19        A.    No, Sir.

20        Q.    Do you have any additional

21    information that you would like to add regarding

22    the claim that you have not already shared with me,

31

```
 1    something that I may have missed that would clarify

 2    any of these issues?

 3           A.   No, Sir, I don't.

 4           Q.   And Dr. Beasley, I would like to ask

 5    you at this time, would you like a copy of your

 6    transcript?

 7           A.   If I it would be possible, it would

 8    be nice to have, Mr. Johnson, just so I could

 9    review it and just make that, you know --

10           Q.   Not a problem.

11           A.   Because the communications were a

12    little strained, I want to make sure the point I

13    was trying to make was well-made.  So how will that

14    be transmitted to me?

15           Q.   I will send it to you Fed Ex.  Let me

16    give you some guidelines, here, and then I will get

17    an address where you would prefer to have your

18    transcript mailed to you.

19           A.   Sure.

20           Q.   These are the guidelines you must

21    follow when you receive the transcript, it's going

22    to be part of the record.
```

                                                    32

1          A.    Okay.

2          Q.    The witness may not make any mark on

3    the transcript itself, but all corrections shall be

4    made on the errata sheet that is provided with the

5    transcript.  Any changes to the original transcript

6    will not be included into the investigative file.

7    The signed transcript and correction sheet are to

8    be returned by mail to the investigator within

9    seven calendar days of the witness' receipt.

10          If the signed transcript and

11    corrections sheet are not returned to the

12    investigator within seven calendar days, it will be

13    deemed that the witness has waived his right to

14    review, correct, and sign.  Witnesses will be

15    encouraged to keep a copy of the errata sheet and

16    the transcript, and the witness may not make

17    substantial changes to their testimony.

18          I am going to mail this to you Fed

19    Ex, and you must provide an address and telephone

20    number where you would prefer to receive your

21    transcript.

22          A.    Okay.  Well, since you're going to

33

1    Fed Ex it, it will probably be safer to send it to

2    my home instead of work, is there any problem with

3    that?

4         Q.    Not a problem.

5         A.    Okay.   Under my name, address would

6    be ▮▮▮▮▮▮▮▮ that's two words, ▮▮▮▮▮

7    ▮▮▮▮▮▮▮▮.   That would be Montgomery, Alabama,

8    zip ▮▮▮▮.   Home telephone number is area code

9    ▮▮▮▮▮▮▮▮.

10        Q.    Okay, is any time to deliver -- what

11   time, maybe?

12        A.    I would say --

13        Q.    What's the best delivery time?

14        A.    Probably in the afternoons between

15   1:00 and 4:00.

16        Q.    Okay.   Dr. Beasley, This ends your

17   sworn statement, thank you for your time and

18   cooperation.

19             (Whereupon, the affidavit was

20   concluded at 3:48 p.m.)

21

22

34

CERTIFICATE OF COURT REPORTER

I, Rebecca Edwardson, a Notary Public
in and for the State of Colorado, before whom
the above-entitled cause was taken, do hereby
certify that the proceedings were taken by me
in shorthand and thereafter reduced to
typewriting under my supervision; that said
proceedings is a true record; that I am
neither counsel for, related to, nor employed
by any of the parties to the action in which
the proceedings were taken; and, further, that
I am not a relative or employee of any
attorney or counsel employed by the parties
thereto, nor financially or otherwise
interested in the outcome of the action.



Rebecca E Edwardson
Rebecca Edwardson
Notary Public in and for
THE STATE OF COLORADO

My commission expires:
July 7, 2007

1

1   IN THE MATTER OF:                    )
                                         )
2   LARRY D. THOMAS                      )
                                         )
3          Complainant,                  )  Complaint No.
           Vs.                           )  2001-0619-
4                                        )  2004102917
    CENTRAL ALABAMA VETERANS             )
5   HEALTHCARE SYSTEM,                   )
                                         )
6          Respondent.                   )
7
8
                   ACKNOWLEDGMENT OF DEPONENT
9
           I, TY BEASLEY, do hereby acknowledge that
10  I have read and examined pages 2 through 34,
    inclusive, of the transcript of my deposition taken
11  on Thursday, October 21, 2004, and that:
       (Check appropriate box)
12  [ ] The same is a true, correct, and complete
    transcription of the answers given by me to the
13  questions therein recorded.
    [ ] Except for the changes noted in the attached
14  Errata sheet, the same is a true, correct, and
    complete transcription of the answers given by me
15  to the questions therein recorded.
16
17
18
19

20  _____              _____
        Date                           Signature
21
22

                                                      35

1                              ERRATA SHEET

2    Page and line number              Correction or

     As reported:                      Change and reason

3    Therefore:

4

5    _____           _____

6    _____           _____

7    _____           _____

8    _____           _____

9    _____           _____

10   _____           _____

11   _____           _____

12   _____           _____

13   _____           _____

14   _____           _____

15   _____           _____

16   _____           _____

17   _____           _____

18   _____           _____

19   _____           _____

20   _____           _____

21   _____           _____

22   _____           _____

36

From: Origin ID: (727)319-1171
Winslon Johnson
Dept of Veterans Affairs
Resolution Management (08J)
10000 Bay Pines Blvd.
St. Petersburg, FL 33708


FedEx
Express

E

CL5091404/05/06

Ship Date: 26OCT04
Actual Wgt: 1 LB
System#: 2453096/INET2000
Account#: S ********

REF:

Delivery Address Bar Code

SHIP TO:                    BILL SENDER
Ty Beasley


Deliver between 1:00pm and 4:00pm

** 2DAY **                                    THU
                                        Deliver By:
TRK# 7919 6479 6726    FORM    28OCT04
                       0201
                                  BHM      A2

36109   -AL-US

SJ MGMA



Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.