# EXHIBIT 10

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION**
**WASHINGTON, D.C. 20420**

Larry D. Thomas, )
)
  *Complainant,* )
)
  v. )  VA Case No. 200I-0619-2004102917
)
Secretary, )
Department of Veterans Affairs )
)
  *Agency.* )

## FINAL AGENCY DECISION

### INTRODUCTION

In a formal EEO complaint dated July 6, 2004, the complainant alleged that officials at the VA Central Alabama Veterans Healthcare System (CAVHS) in Montgomery, Alabama, discriminated against him as referenced below. The Department's Office of Resolution Management accepted and appropriately investigated one of the claims raised in the complaint and properly notified the complainant of its determination to dismiss the remaining claims in accordance with the Commission's regulation governing partial dismissals at 29 C.F.R. Section 1614.107(b).

At the conclusion of the investigation, the Department notified the complainant in writing of the right to request either a hearing and decision by an EEOC administrative judge, with a subsequent final action by the Department, or an immediate final decision by the Department without a hearing. The complainant acknowledged receipt of that notice on December 20, 2004. The complainant initially requested a hearing before an EEOC administrative judge but subsequently withdrew the request. Accordingly, the administrative judge remanded the complaint to the Department's Office of Employment Discrimination Complaint Adjudication for an immediate final agency decision based on the investigative record. OEDCA received the file from the judge on March 7, 2005.

## PROCEDURAL DISMISSAL

The Department's Office of Resolution Management partially dismissed one of the complainant's claims because of untimeliness. Specifically, the complaint file indicates that the complainant alleged that he was harassed and discriminated against on the basis of his race (Black). ORM determined that the complainant failed to discuss this matter with an EEO Counselor within 45 – calendar days of the date of the alleged discriminatory event. The complainant's initial contact with an EEO Counselor was on June 1, 2004, and the case was closed on June 28, 2004, when the EEO Counselor advised the complainant that only the issues brought to the counselor's attention during informal counseling could be included in the formal complaint. Thus, ORM dismissed this claim pursuant to 29 C.F.R. 1614.107(a)(2) because it was not brought to the attention of the EEO Counselor.

Accordingly, for the above stated reasons, it is the final decision of the Department to dismiss the four part claim relating to alleged harassment based on race. The merits of the remaining claim raised in the complaint are addressed below.

## CLAIM

Whether the complainant was discriminated against on the basis of race (Black) when on or about May 14, 2004, the Chief Information Officer informed him that at the end of the work day his employment as the VISTA Imaging Implementation Manager, GS-12, would be terminated during his probationary period for failure to successfully perform the duties of the position.

## SUMMARY OF FACTS

The complainant, race (Black) received a Career-Conditional appointment as a Computer Specialist, GS-2210-12 on May 18, 2003, subject to a one year probationary period. In a memorandum from Human Resources Management Services (HRMS) to the complainant dated May 14, 2004, the complainant was informed of his recommended termination. The Manager, Informatics, recommended the complainant's termination from his position after finding that the complainant demonstrated his unsuitability for the position by his apparent lack of the necessary balance of skills to successfully perform effectively within the position. The complainant was further advised that his discharge from his position as a GS-12, Vista Imaging Implementation Manager was effective that day, May 14, 2004, which was during his probationary period.

Management documented the complainant's performance and conduct as grounds for his termination. Included in the complaint file were redacted comments by management concerning deficiencies in the complainant's work performance. Also included in the complaint file were the complainant's mid-term appraisal for the reporting period May 18, 2003 - - March 31, 2004, that was conducted on October 30, 2003, and which included comments from management that the complainant's work product contained grammatical and

spelling errors, and that the complainant had allowed the laptop computer assigned to him to be used for personal purposes. That appraisal noted concerns regarding the complainant's performance and conduct and indicated that the complainant should have a monthly review of his performance and conduct administered by his supervisor during the remainder of his probationary period (Exh. C-4). The complainant received an overall performance appraisal rating of unacceptable for this period on April 26, 2004 (Exh. C-7).

In a June 17, 2004, memorandum, LT, Chief Information Officer at the above-referenced facility, denied that the complainant's race was a factor in the termination decision. Rather, LT indicated that the complainant's removal was specifically based on eight work-related factors as set forth in the memorandum (Exh. C-4 at page 11). Additionally, memoranda from management in other components at the facility that were serviced by the complainant and his co-workers supported the determination that the complainant should be discharged for the specific reasons cited (Exh. C-4 at pages 12-22).

When examined by the VA EEO Investigator, the complainant stated that his area of responsibility was to facilitate new projects, implement training and instructions to the medical staff, and act as a back-up person to the assistant. The complainant denied management's specific criticisms of his work performance, communication skills, security violation concerning use of a government laptop computer, alleged inability to grasp clinical needs, rules and responsibilities and personal conduct in his interactions with female staff members, and attributed the specific alleged deficiencies cited by management as the reasons for his discharge as essentially discrete misunderstandings between himself and management.

KM, KL and SG testified on the complainant's behalf. KM, race (Caucasian) and employed as the Administrative Officer for the Ambulatory Care Service Line at the above-referenced facility, testified that the complainant communicated well with her during successful implementation training for her clinical staff and that there were no complaints. KM described the complainant's customer service as exceptional and there were no complaints from female staff members. However, KM stated that she had no reason to believe that the complainant's termination was influenced by his race. KL, race (Caucasian) and employed as Manager, Cardiopulmonary Department at the above-referenced facility, stated that the complainant conducted Imaging training for his clinical staff and that there was no negative feedback from his staff regarding the complainant's involvement in the training. KL also described the complainant's e-mail and interpersonal communications with the clinical staff as being professional, his customer service as being excellent, and his conduct with the female members of his clinical staff as being appropriate. SR, race (Asian), and employed as a Staff Physician at the above-referenced facility, denied knowledge of any complaints against the complainant resulting from his staff training, and described the complainant's customer service as excellent.

RMO WG, race (Caucasian) and employed as Chief Information Officer at the above-referenced facility defended the reasons set forth in his June 17, 2004, memorandum concerning the complainant's discharge. RMO WG stated that the complainant's interpersonal communications did not promote good will, because there were instances where the complainant had problems with people running the program, the implementation of the program, the radiologists he trained, and his colleagues in and out of the service. RMO WG denied knowledge of the complainant having developed a program demonstration package that the service liked but was unable to implement because it lacked funding. RMO WG also insisted that management believed that the complainant's communication with those he came in contact with in connection with his work, did not promote good will. RMO WG stated that the complainant did not understand the organizational internal processes and committee structure of the service with respect to his inability to implement the Vista program. Specifically, the complainant needed to meet with service line managers and any global changes should have been reviewed through the service's committee structure. RMO WG denied knowledge of the complainant requesting permission to serve on several different committees. RMO WG stated that the complainant did serve on the Vista Startup Committee, but that the implementation of the program suffered because of the complainant's communication skills and because female employees were uncomfortable working with the complainant. RMO WG stated that lack of membership on a committee did not impede one's ability to raise issues for discussion, but the complainant never presented issues at any of the formal committee meetings. Contrary to the complainant's representations, RMO WG insisted that the Vista system was ready for implementation in December 2003, and the only changes that needed to be made merely required coordination among the persons using the program. RMO WG also stated that the complainant's training documentation contained grammatical errors and was of poor quality, and that lacking a clinical background, the complainant taught the software in the manner he believed was best while disregarding the needs of the radiologists.

Additionally, RMO WG stated that in November 2003, the network swept all of the personal computers on the network for illegal software and discovered illegal software installed on the complainant's laptop. RMO WG also explained that a security violation had occurred whether or not the complainant's son had installed software because the fact that the software had been installed on the complainant's laptop meant either that the complainant had left his machine logged on, shared his access code with his son or allowed his son to install the software.

RMO WG also stated that the complainant's methods of communication often alienated clients and managers. Specifically, the complainant would tell managers how things were going to be done causing friction with employees who were resistant to technology or who did not appreciate the strategy for implementation of the program. RMO WG stated that management was informed by a service line manager that the complainant did not work well with all of the managers. In addition, RMO WG stated that there were concerns about the complainant's interactions with female staff members involving sexual

4

harassment by the complainant. Finally, RMO WG denied that the complainant's performance was impeded by working under a System Manager's Position description.

TB, race (Caucasian) and employed as Pharmacy Programs Specialist, i.e., Clinical Informatics Team Leader at the above-referenced facility, who worked under RMO WG's supervision, and was familiar with the complainant's involvement in the development and implementation of the program, and the training of clinical staff, stated that he did not believe that the complainant was terminated during his probationary period because of his race.

RMO HC, race (Hawaiian-German) and employed as Veterans Integrated Service Network 7 Network (VISN 7) Systems Telecom Administrator, stated that he was the Acting Chief Information Officer for the above-referenced facility until October 2003, and approved the selection of the complainant for the position. RMO HC stated that there were problems from the beginning with the complainant's inability to communicate when training clinicians. RMO HC stated that there were complaints from the service chiefs in the radiology area and other areas that the complainant was not communicating with them regarding implementation of the program. RMO HC also stated that the training program had to be rewritten completely because it was unorganized and very confusing for clinicians.

SV, race (Asian), and employed as Systems Manager for Vista Imaging at the above-referenced facility, stated that the complainant failed to follow the direction of the VISN initiative regarding implementation of the program. SV stated that the complainant would make decisions on his own without involving or communicating with the managers of the service lines where the program was being implemented, thereby causing problems for the entire hospital. SV stated that the complainant did not know how to use "spell check" or the thesaurus, and he also did not understand how the Vista Imaging program worked. SV also stated that she filed a complaint against the complainant. SV stated that the complainant was a very bad person because he was very forward with females and did not like women who had something to say. SV stated that their work relationship set back implementation of the program at the facility for nearly four months.

LK, race (Black) and employed as Chief of Human Resources Management Services (HRMS) at the above-referenced facility, stated that the service recommended the complainant's termination based on documentation evidencing poor customer service, poor training, and failure to perform at the GS-12 pay grade level. LK stated that she had no reason to believe that the complainant was terminated during his probationary period because of his race.

## ANALYSIS

### 1. Statement of Applicable Law

The law prohibiting discrimination based on race is Title VII of the Civil Rights Act of 1964, as amended, Section 701 et seq., 42 U.S.C. 2000e et seq. ("Title VII"). Federal sector equal employment opportunity regulations are set out in 29 C.F.R. Part 1614.

Generally, the adjudication of a complaint of discrimination alleging disparate treatment under Title VII follows a three-step evidentiary analysis. First, the burden is on the complainant to establish a prima facie case of discrimination by a preponderance of the evidence. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 5 FEP Cases 965 (1973); Board of Trustees of Keene State College v. Sweeney, 439 U.S. 24, 18 FEP Cases 520 (1978); Furnco Construction Corporation v. Waters, 438 U.S. 567, 17 FEP Cases 1062 (1978). This means that the complainant must present a body of evidence such that, were it not rebutted, the trier of fact could conclude that unlawful discrimination did occur. Teamsters v. U.S., 431 U.S. 324, 14 FEP Cases 1514 (1977). A complainant raises an inference of discrimination by showing that the reasons most commonly given by management to justify a particular employment decision or action do not apply in the complainant's case.

Second, if the complainant meets the burden of presenting a prima facie case, then management has a burden of production to articulate some legitimate, nondiscriminatory reason for its actions. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 25 FEP Cases 113 (1981). The evidence presented by management need not establish management's actual motivation, but must be sufficient to raise a genuine issue of material fact as to whether management discriminated against the complainant. If management meets this burden of production, the presumption of discrimination raised by the prima facie case is rebutted and drops from the case altogether. Burdine, 25 FEP Cases 116.

Third, in order to prevail, the complainant must show by a preponderance of the evidence that management's stated reason is a pretext for discrimination. Price Waterhouse v. Hopkins, 490 U.S. 228, 49 FEP Cases 954 (1989); Burdine, 25 FEP Cases 116; McDonnell Douglas, supra. The complainant may show pretext by evidence that a discriminatory reason more likely than not motivated management, that management's articulated reasons are unworthy of belief, that management has a policy or practice disfavoring the complainant's protected class, that management has discriminated against the complainant in the past, or that management has traditionally reacted improperly to legitimate civil rights activities. McDonnell Douglas, supra.

The ultimate burden of showing that management intentionally discriminated against the complainant remains at all times with the complainant. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 31 FEP Cases 609 (1983); Burdine, 25 FEP Cases 116. A finding of pretext – i.e., a finding of sufficient evidence to disbelieve management's stated reason for its decision –

6

does not necessarily compel a finding of discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993). Proof of pretext is simply one form of circumstantial evidence that is probative of intentional discrimination, and such proof may be quite persuasive. Thus, a complainant's prima facie case, when combined with sufficient evidence to find that management's asserted justification is false, may permit a finding of discrimination. Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 82 FEP Cases 1748 (2000). This is not to say that such a showing will always be adequate to find discrimination. As the Supreme Court noted in Reeves, there will certainly be instances where, despite such a showing, the record conclusively reveals some other nondiscriminatory reason for management's decision, or if the complainant presented only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred. Thus, for example, if the circumstances show that management gave a false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent. Reeves, supra (citing Fisher v. Vassar College, 114 F.3d 1332, 1338 (2nd Cir. 1997). Whether a finding of discrimination is appropriate in a particular case will depend on a number of factors, including the strength of the complainant's prima facie case, the probative value of the proof that management's explanation is false, and the strength of other evidence that discrimination did not occur. Reeves, supra.

Moreover, the analytical framework in McDonnell Douglas "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." Furnco, 17 FEP Cases at 1066. Thus, whether or not a complainant has established a prima facie case, where management has provided a legitimate, nondiscriminatory explanation for its action, the factual inquiry must proceed to a decision on the ultimate factual issue in the case -- i.e., whether management's actions were discriminatory within the meaning of Title VII. Aikens, supra.

The elements of a prima facie case of discrimination are determined by the factual circumstances of the case and the bases of discrimination alleged. McDonnell Douglas, 5 FEP Cases 969 n.13. Here, the complainant alleged disparate treatment with respect to his termination during his probationary period based on race.

In order to establish a prima facie case of disparate treatment, a complainant must generally show (1) membership in a protected class, (2) an employment situation comparable to that of other employees not of the same protected class, and (3) treatment that is different than that experienced by those other employees with respect to the terms, conditions, or benefits of employment. McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 12 FEP Cases 1577 (1976); Scott v. Secretary of Defense, EEOC Appeal No. 01902727 (September 24, 1990).

7

2004, memorandum concerning the complainant's termination. RMO WG elaborated upon those reasons during his testimony taken during the investigation. In sum, RMO WG stated that the complainant's interpersonal communications did not promote good will, because there were numerous instances where he had problems with co-workers and service line managers regarding implementation of the program, the radiologists during training, and his colleagues in and out of the service. In addition, the complainant was the subject of a complaint involving an allegation of inappropriate sexual behavior. RMO HC stated that there were problems from the beginning with the complainant's inability to communicate when training clinicians and his training program had to be re-written. As set forth in the June 17, 2004, memorandum, the complainant was terminated for these reasons, as explained by the responsible management officials, and supported by the other evidence in the record.

### *Pretext*

The complainant has failed to prove by a preponderance of the evidence that the reasons articulated and shown through the evidence of record are a pretext for the race discrimination alleged in the complaint. None of the evidence in the record supports the complainant's allegations of discrimination, and one cannot reasonably infer from the complainant's testimony nor that of his several witnesses that management discriminated against him on the basis of his race when he was terminated during his probationary period.

It is not a function of the EEO process to restrain management's employment decisions or to substitute another judgment for that of the deciding official. It is not the place of a trier of fact to second-guess management's personnel decisions absent a demonstrably discriminatory motive Loeb v. Textron, Inc., 20 FEP Cases 29 (1st Cir. 1979).

Our finding that the complainant has not sustained his burden of persuasion is not an endorsement of the removal decision in question, but merely reflects the limited focus of our inquiry. Title VII does not protect against unfair business decisions, but only against decisions motivated by an unlawful animus. Turner v. Texas Instruments, Inc., 555 F.2d 1251, 15 FEP Cases 746, 750 (5th Cir. 1977). To paraphrase the Burdine court, 25 FEP Cases at 118, the fact that one may think that that the complainant's removal was carried out arbitrarily, does not in itself create Title VII liability. See also, St. Peter v. Secretary of the Army, 659 F.2d 1133, 1138 n.5, 26 FEP Cases 194, 197 n.5 (D.C. Cir. 1981).

### CONCLUSION

The complainant has failed to establish by a preponderance of the evidence that he was discriminated against as alleged in his complaint.

### RIGHT OF APPEAL

Within 30 days of receipt of this final decision, the complainant has the right to appeal it to: **Equal Employment Opportunity Commission, Office of Federal**

Operations, P.O. Box 19848, Washington, D.C. 20036. If an appeal is filed, EEOC Form 573 should be used. A copy of EEOC Form 573 is attached.

A copy of the appeal to the EEOC must also be sent to the VA Office of General Counsel at the following address: **Department of Veterans Affairs, Office of the General Counsel (024), 810 Vermont Ave., N.W., Washington, D.C. 20420.**

Statements or briefs in support of the appeal **must** be submitted to the EEOC within 30 calendar days of the filing of the appeal. <u>A copy of any such statement or brief, including any statements made on EEOC's "Appellant Docketing Statement", must also be sent to the VA's Office of General Counsel at the above address.</u>

If an appeal is filed with the EEOC, the appeal, and any subsequently filed statement or brief, **must** contain a statement certifying the date and method by which copies of these documents were served on the VA's Office of General Counsel.

If the complainant files an appeal with the Commission beyond the above-noted time limit, the complainant should provide the Commission with an explanation as to why the appeal should be accepted despite its untimeliness. If the complainant cannot explain why timeliness should be excused, the Commission may dismiss the appeal as untimely.

### RIGHT TO FILE A CIVIL ACTION

The complainant also has the right to file a civil action in an appropriate United States District Court. The complainant may file a civil action

> within 90 days of receipt of this final decision <u>if no appeal to EEOC has been filed</u>; or

> within 90 days after receipt of the EEOC's final decision on appeal; or

> after 180 days from the date of filing an appeal with the EEOC if there has been no final decision by the Commission.

The complainant **must** name the person who is the official head of the Department of Veterans Affairs as the defendant. Department means the national organization, and not just the local office, facility, or unit in which the complainant works. The complainant may not name just the Department. The complainant must name **R. James Nicholson** as the defendant. The complainant must also state the official title of the Department head. The official title of the head of the Department of Veterans Affairs is **Secretary of Veterans Affairs**. Failure to provide the name or official title of the head of the Department may result in dismissal of the case.

10

If the complainant decides to file a civil action under Title VII (discrimination due to race, color, religion, sex, national origin, or reprisal) or under the Rehabilitation Act of 1973, as amended, (discrimination due to disability), and if the complainant does not have or cannot afford the services of an attorney, the complainant may request that the Court appoint an attorney to represent the complainant and that the Court permit the complainant to file the action without payment of fees, costs, or other security. **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action <u>MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS</u> of the date the complainant receives the final decision from the Department or the Commission.

_____          4-25-05
CHARLES R. DELOBE                    Date
Director, Office of
Employment Discrimination
Complaint Adjudication

Attachment: EEOC Form 573

| Veterans Administration | ORM FAX TRANSMITTAL |
|---|---|

This transmission is intended only for the use of the person or office to whom it is addressed and may contain information that is privileged, confidential, or protected by law.

All others are hereby notified that receipt of this message does not waive any applicable privilege or exemption from disclosure and that any dissemination, distribution, or copying of this communication is prohibited.

If you have received this communication in error, please notify us immediately at the telephone number shown below. Thank you.



**Department of Veterans Affairs**
**Office of Resolution Management**
**Bay Pines, Florida**
*Fax Commercial: 727-319-1150*

| TO: Mr. Rand Neeley, Esq. US Attorney's Office, Montgomery, Al 36083 | FAX NUMBER 334-223-7560 | | COMMERCIAL | DATE 9/29/06 | NO. PAGES ATTACHED 13 |
|---|---|---|---|---|---|

SUBJECT:
Information requested on Larry D. Thomas – Regarding Final Agency Decision
Please call if we can be of further assistance.

| FROM: Alyicia Tirado, PhD – Intake Specialist *Alyicia Tirado, PhD* | TELEPHONE NUMBER 727-319-1167 | | X | Fax 727-319-1343 |
|---|---|---|---|---|

Automated VA Form 10-0114R