# EXHIBIT 2

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| LARRY D. THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO.: **02:05-CV-437-WKW** |
| | ) |
| R. JAMES NICHOLSON, | ) |
| SECRETARY, DEPARTMENT OF | ) |
| VETERANS AFFAIRS, | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF WILLIAM H. GREER

My name is William H. Greer and I am over the age of 18 years and a resident of the State of Alabama. I am a Caucasian male. The information contained in this declaration is based upon my personal knowledge and observations unless otherwise noted.

I am presently employed by the Department of Veterans Affairs as the Chief Informatics Officer (CIO) for the Central Alabama Veterans Healthcare System (CAVHCS) and have been so employed since October, 2003. Prior to that time I was employed as the IT Operations Manager (Hardware) at CAVHCS from February, 2003 until being promoted to the position of CIO in October, 2003. At all times relevant to the complaint, I was a senior member of the IT staff at CAVHCS. My first line supervisors were Ms. Antonio Muhammad, IT Operations Manager for software and Mr. Mark Kuehndorf, IT Operations Manager for hardware.

CAVHCS is located within Veterans' Integrated Systems Network area 7 (VISN 7) which is compromised of all VA facilities within the 3 state area of Alabama, Georgia and South Carolina. At any given time, any of the various IT functions at each facility within VISN 7 are coordinated with one and the other so that the actual use of any IT function / service by the actual end users is uniform. The installation and implementation of the VISTA Imaging System was one such IT function that was a VISN wide event. Accordingly, this function was managed at the VISN 7 level and I was required to report to Mr. Harold Carlisle, VISN 7 Network Systems Telecom Administrator.

Sometime prior to May 18, 2003, it became necessary to hire someone to act as the VISTA Imaging Systems Implementation Manager for CAVHCS. I served on the selection panel that interviewed Mr. Thomas and any other candidates for the position but Mr. Harald Carlisle was the selecting official. I have no personal recollection of the selection process. Similarly, I have no recollection of any perception I may have had of Mr. Thomas' race based upon his speech. I am certain, though, that Mr. Thomas' race played no part in my decisions in regards to any actions, favorable or otherwise, that I took or participated in during the course of his employment. In fact, since October, 2003, I have been the selecting official for no less than 8 positions within the IT service of CAVHCS and 7 of the persons I have selected were African American. Similarly, I have had 2 opportunities since October, 2003, to promote individuals within the IT service of CAVHCS and both of those promotions have gone to African Americans.

VISTA is a computer operating system much like Windows. VISTA imaging is a feature of the system which allows for the production of digitally formatted, computer stored images such as x-rays and medical records. As it is computer based, the VISTA system allows medical professionals in one hospital, for example, to view over the system, images taken at another location instantaneously. The system, therefore, allows, amongst other things, two doctors, in two different hospitals, the ability to view at the same time, the same x-ray, without the delay and expense occasioned by reproduction of the film and transmission by some other means such as facsimile or the mails. Given the digital format of the image, each doctor simultaneously and instantaneously with its' production, can view the same x-ray in its original state.

On site at CAVHCS, as in the other medical facilities within VISN 7, there are IT positions dedicated almost exclusively to VISTA. Amongst these are the VISTA Systems Manager and VISTA Imaging Implementation Manager. In essence, the systems manager is responsible for the installation and maintenance of all hardware and software while the implementation manager is responsible for the training and education of end users. Given the interdependence of these two functions, it is preferred that the persons filling the two positions have a team type working relationship. It is also ideal that the persons filling these positions be familiar and technically proficient in both positions so that they may provide backup to one and the other. At all times relevant to this matter, Ms. Saundrah Venne was the VISTA system manager.

The implementation position which Mr. Thomas was hired to fill required him to produce training materials and provide training on the VISTA imaging system to end users such as physicians, nurses and other medical and administrative personnel of CAVCHS. Accordingly, the position required an understanding of abstract computing principles and a mastery of basic computer skills, as well as the ability to effectively and accurately communicate both orally and in writing. Given the resistance to change which is natural to humans, the position also required a certain ability to motivate and encourage the end user to master usage of the system and to accept the change in procedures occasioned by its implementation. Finally, given the VISN wide implementation of the system and the multi-leveled management and decision making structure of CAVHCS, the position required that Mr. Thomas work within established procedures and methods to effectively perform his job.

As previously stated I became the Chief Informatics Officer (CIO) for CAVCHS in October, 2003. In this position I became Mr. Thomas' first line supervisor with the sole authority to recommend his termination or continued employment at the end of his probationary period on May 18, 2004. Based upon what I believe to be truthful information related to me by others with knowledge, and my own interactions with, and observations of Mr. Thomas' performance I concluded that he lacked the necessary skills to effectively and successfully perform the functions of the position. Given the various shortcomings to be discussed herein, I unilaterally determined that Mr. Thomas should

not be retained by the agency at the end of his probationary period.

       After assuming my new duties in October, 2003, I met with Mr. Thomas to provide him with a mid-term appraisal of his performance. While I had not been his first line supervisor prior to October, I had worked with him in the VISTA implementation program as a senior member of CAVHCS IT team. As noted in my comments to that appraisal, a copy of which is attached hereto as Attachment F, Mr. Thomas was provided a copy of the VISTA Implementation Managers standards on October 30, 2003, to coincide with the Position Description he had received upon his arrival at CAVHCS. As the attached reveals, my primary concerns at the time of this mid-term appraisal were of a general nature. I was concerned that Mr. Thomas' oral and writing skills were inadequate and not commensurate with the level of performance mandated by the position he was filling. More particularly, it had become necessary for all material prepared by Mr. Thomas which was to be sent or presented to persons outside of IT to be reviewed by me and / or other members of the IT staff before they could be disseminated. Mr. Thomas' e-mails are one such example. Often they were inundated with grammatical and spelling errors. Similarly, training materials produced by Mr. Thomas also contained grammatical and spelling errors. In an effort to assist Mr. Thomas overcome these shortcomings, I suggested that he pursue an academic course in basic English and composition. I also suggested that Mr. Thomas join the CAVHCS Toastmasters organization.

       On March 18, 2004, I met with Mr. Thomas once again in regards to the issue of

his oral and written communication. As Mr. Thomas had not, to my knowledge, taken

any steps to correct the problem as suggested to him in October, 2003, I ordered him to

take "Avoiding Grammatical Errors in Business Writing" administered online by the

Veterans Administration. I allowed him to take this 4.5 hour course during the course of

his regular duty day. Between March 18, 2004 and May 18, 2004, their was no

improvement in his ability to effectively communicate orally or in writing.

Needless to say, Mr. Thomas' poor oral and written communication skills

hampered him in the performance of his duties related to training. In fact, Mr. Thomas'

initial written training materials were of such poor quality that all had to be reviewed by

me and other members of my staff before they could be distributed to end users. It also

became necessary for me and members of the IT staff to preview his oral presentations,

for clarity and relevance. More particularly, Mr. Thomas did not seem to have the

interest, patience or ability to tailor his presentations to the audience to whom he was

speaking. VISTA is a large system with many components, all of which are not used or

needed by all the various services within CAVHCS. For example, instead of presenting

to radiologists detailed information tailored to the specific topic of the use of VISTA in

the practice of radiology, Mr. Thomas would use a standardized "one size fits all"

presentation which was less detailed and, in reality, an inefficient use of the practitioners'

and Mr. Thomas' time.

Over the course of Mr. Thomas' employment, I, as well as others, became

concerned that Mr. Thomas did not possess an understanding of basic abstract computing

principles nor a mastery of basic computer skills.  Mr. Thomas would frequently inquire

about basic computer functions that the multiple certifications he possessed would

indicate he had mastered.  In fact, his repeated inquiries, as well as actions taken,

suggested that his credentials may not be valid.  For this reason, it was decided by Mr.

Carlisle, and agreed upon by me, that we require Mr. Thomas to produce copies of his

credentials.  While Mr. Thomas did, ultimately, have the credentials that he had

represented he possessed, subsequent investigation revealed that the credentials were

acquired from a training institute for which he subsequently worked.  All in all, I was left

with the impression that the credentials received were not truly earned as Mr. Thomas'

demonstrated abilities with the exact systems for which he was certified were not

consistent with the abilities the certifications implied that he had.  Never before, nor have

I since, felt that any of my employees were so lacking in basic skills, that I agreed with or

requested that the employee provide me with actual copies of their credentials.

On more than one occasion during his employment Mr. Thomas displayed a

disdain for established procedures and protocols.  CAVCHS is a large medical facility

providing a wide array of medical and social services to the veterans of Central Alabama

and as such has many established procedures for policies to perform its mission both

comprehensively and efficiently.   Given that changes in one procedure or policy in one

portion of CAVHCS may have unintended negative results in another portion of the

system, a committee structure is in place. In effect, all changes in policies or procedures are put through various committees which study all the consequences of any proposed change. In this regard, Dr. Judith St. Onge, who at the time was Acting Associate Director for Operations, related to me two separate incidents that she had with Mr. Thomas. These incidents occurred on April 20, 2004, and May 7, 2004, and were related to me by Dr. St. Onge shortly after they transpired. As Dr. St. Onge's reports of contact for these incidents disclose, Mr. Thomas had a serious and irreconcilable conflict with the then existing policies and practices of CAVHCS and demonstrated little, if any, willingness to adhere to them.

Like Dr. St. Onge, other employees of CAVHCS indicated to me that Mr. Thomas was either unable or unwilling to learn, adhere to or adopt established policies and practices of CAVHCS. In the interest of brevity I incorporate by reference as if fully set forth herein, statements received from Mark D. Kuehndorf (Attachment A), Mr. William Piper (Attachment B) and Mr. Ty Beasley (Attachment C). The events and sentiments reflected in all of these statements were known to me at the time I determined to terminate Mr. Thomas' employment with CAVHCS and I had no reason to believe then, nor do I have any reason to believe now, that the events reflected therein did not occur as described. Never before, nor have I since, supervised an employee who repeatedly ignored, at best, or blatantly disregarded, at worst, the established policies and practices of CAVHCS.

Over the course of his employment with CAVHCS, Mr. Thomas displayed an inability to personally conduct himself in a professional manner consistent with the expectations of all employees of CAVHCS, generally, and the employees I supervise specifically.  In the interest of brevity I am incorporating by reference as if fully set forth herein, statements received from Ms. Judy Sumner (Attachment D), Dr. Himanshu Singh (Attachment E), and Mr. William Piper (Attachment B).  The events and sentiments reflected in all of these statements were known to me at the time I determined to terminate Mr. Thomas' employment with CAVHCS and I had no reason to believe then, nor do I have any reason to believe now, that the events reflected therein did not occur as described.  Never before, nor since that time, have I had an employee that displayed such unprofessional and inappropriate behavior.

Regarding Mr. Thomas' claim regarding office space, he was initially assigned to work in the same office as the VISTA Systems Manager, Ms. Venne.  Then, as now, space was limited and it was envisioned that MS. Venne and the plaintiff would work closely together and be familiar with and technically proficient in both positions so that they may provide backup to one and the other.  Over the course of months following the plaintiff's arrival, tension developed between the two employees, which ultimately resulted in Ms. Venne filing a complaint of sexual harassment against the plaintiff.  This matter was resolved internally through the mediation process and it was agreed by Mr. Thomas that he would physically relocate to the Clinical Informatics Training Room,

which ultimately made him more readily available to provide training.  During the relevant time frame, the Informatics service line to which Mr. Thomas was assigned, had no other office space in which he could be placed.

Finally, as part of terminating Mr. Thomas from his employment, I consulted with the Chief, Human Resources Management, Ms. Linda King, and confirmed with her that the last day of Mr. Thomas' probationary period of employment was Friday, May 14, 2004.  I was aware then that termination during the probationary period would not entitle Mr. Thomas to certain procedural safeguards available to non-probationary federal employees, but I felt that all of the issues discussed herein were indicative of his inability to satisfactorily perform the duties of the position.  I also did not deem Mr. Thomas to be suitable for continued federal employment with CAVHCS.  My decision to terminate him during his probationary period was in no way related to his race.

In summation, Mr. Thomas, over the course of his probationary period, did not display the necessary technical, communication or "people" skills to successfully perform the position for which he was hired.  Moreover, he did not display a willingness, even after consultation and counseling, to improve on any of these areas.  I believed then, and continue to believe today, that the best interests of CAVHCS were served by Mr. Thomas' termination.

during his probationary period was in no way related to his race.

In summation, Mr. Thomas, over the course of his probationary period, did not display the necessary technical, communication or "people" skills to successfully perform the position for which he was hired.  Moreover, he did not display a willingness, even after consultation and counseling, to improve on any of these areas.  I believed then, and continue to believe today, that the best interests of CAVHCS were served by Mr. Thomas' termination.

Pursuant to Title 28, United States Code, § 1746, I declare under penalty of perjury that the foregoing, as well as the contents of the attached statement dated June 14, 2004,  are true and correct.

Executed on this 11th day of October, 2006.

WILLIAM H. GREER

### IN THE DISTRICT COURT OF THE UNITED STATES
### FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

LARRY D. THOMAS,          )
                                )
      Plaintiff,           )
                                )
      v.                )  CIVIL ACTION NO.: **02:05-CV-437-MHT**
                                )
R. JAMES NICHOLSON,      )
SECRETARY, DEPARTMENT OF   )
VETERANS AFFAIRS,       )
                                )
      Defendant.       )

### DECLARATION OF MARK D. KUEHNDORF

My name is Mark D. Kuehndorf and I am over the age of 18 years and a resident of the State of Alabama.  I am a Caucasian male.  The information contained in this declaration is based upon my personal knowledge and observations unless otherwise noted.

I am presently employed by the Department of Veterans Affairs as Operations Manager - Hardware, assigned to Informatics for the Central Alabama Veterans Healthcare System (CAVHCS) and have been so employed since March, 2004.

As a part of my official duties I had contact with Mr. Larry Thomas on numerous occasions.  Attached and incorporated by reference herein is a statement prepared by me on the date indicated which truthfully and accurate reflects the event(s) contained therein.

Pursuant to Title 28, United States Code, § 1746, I declare under penalty of perjury that the foregoing, as well as the contents of the attached statement dated June 8, 2004, are true and correct.

Executed on this 11th day of October, 2006.

MARK D. KUEHNDORF

| REPORT OF CONTACT<br>NOTE: This form must be filled out in ink or on typewriter as it becomes a permanent record in veterans' folders. | VA OFFICE | ENTIFICATION NOS. (C,XC,SS,XSS,V,K, etc.) |
|---|---|---|

| E-FIRST NAME-MIDDLE NAME (Type or print)<br>orf, Mark D | DATE OF CONTACT<br>8 June 2004 |
|---|---|
| ADDRESS | TELEPHONE NO.<br>6353 |
| PERSON CONTACTED | TYPE OF CONTACT   (Check)<br>· PERSONAL   · TELEPHONE |
| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

Statement concerning Larry Thomas:

I had infrequent contact with Mr. Thomas from my date of hire, 22 March 2004, until his termination.

Other than greetings in the hall, contact was initiated by Mr. Thomas when he would come to my office on the East Campus. Each visit would begin with a friendly overture and an offer of assistance as I was a new employee. He would then tell me of an individual that he had met with that needed some computer assistance or an item of equipment. "I was speaking with Mr. Somebody the other day and I noticed that they had a CRT monitor. I told them that I would contact you and you would provide them a flat panel monitor," or similar statements relating to equipment failures and user requests for assistance. I indicated that I would look into the matters he brought to my on, but that there was an established procedure by which equipment could be requested or by which equipment faults could be addressed and resolved.

For me the time consumed in each visit was non-productive, but seemed to provide him the appearance of productivity as these meetings were later referred to in the presence of others. I felt that Mr. Thomas was involving himself in matters outside of his area of responsibility. After approximately three of these visits, I recognized the pattern and would avoid them by politely excusing myself from the office and moving to my next task.

During the execution of my regular duties, I had opportunity to observe Mr. Thomas in various locations throughout the East Campus hospital. I noted that he was often in conversation with female employees and the overheard snippets of conversation did not seem to be related to his duties with VistA Imaging. While not inappropriate, the body language and tone that I overheard left me with the impression that Mr. Thomas was engaged in a flirtatious conversation. Initially passing the group in conversation, completing my task and then returning to my duty area, I would regularly see that Mr. Thomas was still engaged in conversation.

| OR SECTION<br>Informatics | EXECUTED BY (Signature and Title)<br>Mark D. Kuehndorf, Ops Manager - Hardware | 8 June 2004 |
|---|---|---|

Automated VA Form 119

Attachment A (7)

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LARRY D. THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) CIVIL ACTION NO.: **02:05-CV-437-MHT** |
| | ) |
| R. JAMES NICHOLSON, | ) |
| SECRETARY, DEPARTMENT OF | ) |
| VETERANS AFFAIRS, | ) |
| | ) |
| Defendant. | ) |

### DECLARATION OF WILLIAM E. PIPER

My name is William E. Piper and I am over the age of 18 years and
a resident of the State of Alabama. I am a Caucasian male. The
information contained in this declaration is based upon my personal
knowledge and observations unless otherwise noted.

I am presently employed by the Department of Veterans Affairs
as Supervisory Biomedical Engineer for the Central Alabama Veterans
Healthcare System (CAVHCS) and have been so employed since January
1992.

As a part of my official duties I had contact with Mr. Larry Thomas
on numerous occasions. Attached and incorporated by reference

Attachment B

herein is a statement prepared by me on the date indicated which truthfully and accurate reflects the event(s) contained therein.

Pursuant to Title 28, United States Code, § 1746, I declare under penalty of perjury that the foregoing, as well as the contents of the attached statement dated June 14, 2004, are true and correct.

Executed on this 11th day of October, 2006.

_____

**WILLIAM E. PIPER**

Subject: Mr. Larry Thomas                                    June 17, 2004

Mr. Greer,

My experience with Mr. Larry Thomas is that he is non-professional and talks down to
my staff and myself. I asked Mr. Thomas and notified him not to work on medical
devices and for any medical device troubles, enter an electronic work order. Even after
the notice, Mr. Thomas created a trouble with the Columbus Clinic Eye Camera and then
he left the clinic without notifying the clinic and/or the Biomedical Section. The
Columbus Clinic reported the trouble after learning about it and the Biomedical Section
had to re-install the client software to correct the problem. In this case, the Biomedical
Section handled without having vendor service. In another trouble, Mr. Thomas worked
on the Eye Camera in Optometry at the West campus, he load drivers, then delete the
network setting, and then tried to re-load the software. After he could not get the system
to work, he told Optometry that Biomedical Section must have a problem with the
equipment. Again, the Biomedical Section had to re-install the software to repair the
medical equipment. In another instance, the Cardio Respiratory Section received a quote
from GE to upgrade their Holter system to work with the MUSE system to communicate
with VISTA. Approval was given to purchase the upgrade by the Equipment Committee.
GE given a purchase order and was making a site visit for the upgrade, Mr. Thomas told
Cardio Respiratory the upgrade would not work and to cancel the purchase order and
make another upgrade/equipment request for $90,000. In receiving this information from
Mr. Thomas, Cardio Respiratory cancelled the upgrade and losing $14,000 for the
upgrade. The Biomedical Section looked again into the upgrade and the $14,000 upgrade
would have provided the VISTA communication needed. In addition, my female staff
advised me that Mr. Thomas was grabbing his gentiles and/or penis in front of her. She
asked him to stop but his reply was I am just adjusting myself. She did not feel safe
working with him and I advised her to keep her distance and/or to have a co-worker with
her when working with him and I notified Mr. Greer of his employee actions.

William Piper

Attachment B   (12)

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

LARRY D. THOMAS,                        )
                                        )
    Plaintiff,                          )
                                        )
      V.                              ) CIVIL ACTION NO.: **02:05-CV-437-WKW**
                                        )
R. JAMES NICHOLSON,                     )
SECRETARY, DEPARTMENT OF                )
VETERANS AFFAIRS,                       )
                                        )
    Defendant.                          )

**DECLARATION OF TYRON C. BEASLEY**

My name is Tyron C. Beasley and I am over the age of 18 years

and a resident of the State of Alabama. I am a Caucasian male. The

information contained in this declaration is based upon my personal

knowledge and observations unless otherwise noted.

I am presently employed by the Department of Veterans Affairs

as Pharmacist, Program Specialist, assigned as the Clinical Informatics

Team Leader for the Central Alabama Veterans Healthcare System

(CAVHCS) and have been so employed since January 2003.

As a part of my official duties I had contact with Mr. Larry

Thomas on numerous occasions. Attached and incorporated by

reference herein is a statement prepared by me on the date

Attachment C

indicated which truthfully and accurate reflects the event(s)
contained therein.

Pursuant to Title 28, United States Code, § 1746, I declare under
penalty of perjury that the foregoing, as well as the contents of the
attached statement dated June 17, 2004, are true and correct.

Executed on this 11th day of October, 2006.

*Tyron C. Beasley*

TYRON C. BEASLEY

**MEMORANDUM**                                           June 17, 2004

Re: Clinical Informatics Team Leader comments about Larry D. Thomas performance as VistA Imaging Implementation Manager.

Larry D. Thomas was associated with the Clinical Informatics Team mainly due to the training component that was associated with the position he held as VistA Imaging Implementation Manager. Because of this I was involved in assisting Larry as a resource. During this time of his employment I worked and met with Larry fairly often to go over processes and methods of approaching stakeholders that he needed to work with in rolling out the VistA Imaging project. I reviewed training material and resources prior to the use of the materials for official training. I will list some observations I have based on my experience in working with Larry.

- Larry always had a good attitude about what he was trying to accomplish, however he often struggled with not being able to form up a plan and execute the plan successfully.
- Larry was not communicating with stakeholders in the clinical services on a level required of an implementation manager. There were often significant mistakes in his oral and written communications. Sometimes I was aware of these communications in advance and was able to assist in recommended revisions before sending out and other times not. Although an emphasis was placed on improving these communications there was little evidence of consistent improvement.
- Larry's approach with other service managers and supervisors was often strained to the extent it required intervention by me or another informatics supervisor. I think he meant well but the communications and approach on the manager level was not very well received.
- Larry did not retain a clear understanding of organizational structure although attempts were made to explain the health system organizational structure and he was a recipient of the same information sent to as all of the informatics staff on organizational changes.
- Larry was difficult to locate on a fairly consistent basis, especially when he was relocated to another office area in the building. There were times when neither others nor I could reach him on a duty status by telephone, pager, or cellular phone. Others in the informatics service voiced this concern from time to time.
- Although an effort was made to avail Larry of off site training opportunities related to VistA Imaging there was a general feeling from the sites providing this training that he was not actively engaged.
- The national training and implementation staff representing VistA Imaging did not have a very good impression of our site preparation for their initial scheduled visit to train end-users and other informatics staff. The lack of coordination between the VistA Imaging Team and software required the trainers to spend a significant portion of their first visit on set-up procedures. This ultimately

Attachment C    (13)

contributed to the need for a return visit of the national training staff to finish training and a delay in the site implementation schedule.

- Although there were frequent requests for the information, Larry did not consistently provide training records to our education recorder so users would get proper credit in the education tracking system. This basically made it difficult to determine who had received training and when the training was performed.
- Larry did not learn well from internal training on steps needed to set up the system for VistA Imaging and often relied on others to perform these steps. Adequate effort was made to explain these processes but he did not seem to learn from each experience.
- Larry did not read his VistA mail messages and therefore missed a lot of important communications about software patches and package announcements.
- The level of coordination between VistA Imaging Implementation Manager, VistA Imaging Systems Manager, and Biomedical Engineering staff was frequently strained. Although there was a need to closely communicate and coordinate on the VistA Imaging implementation project there were times where key information was not being shared among these stakeholders. This lead to marginal implementation results. I would not implicate Larry as the sole reason for this but he shared in the responsibility.

All in all, my personal experience with Larry D. Thomas was that he was a good person that meant well. However, I truly consider Larry to have been under prepared professionally for the job he as assigned as VistA Implementation Manager. He did not bring the skills set to this position that was needed to be successful nor was there a significant effort on his behalf to improve his skills set.

Signed,

*Ty Beasley*

Ty Beasley
Clinical Informatics Team Leader
VA Central Alabama Healthcare System

14

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LARRY D. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 02:05-CV-437-MHT |
| | ) | |
| R. JAMES NICHOLSON, | ) | |
| SECRETARY, DEPARTMENT OF | ) | |
| VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

### DECLARATION OF JUDY SUMNER

My name is Judy G. Sumner and I am over the age of 18 years and a resident of the State of Alabama. I am a Caucasian female. The information contained in this declaration is based upon my personal knowledge and observations unless otherwise noted.

I am presently employed by the Department of Veterans Affairs as Biomedical Equipment Technician for the Central Alabama Veterans Healthcare System (CAVHCS) and have been so employed since April 2003. During the time frame of May 18, 2003 through May 18, 2004, I was employed at CAVHCS as Biomedical Equipment Technician.

As a part of my official duties I had contact with Mr. Larry Thomas on numerous occasions. Attached and incorporated by reference

Attachment D

herein is a statement prepared by me on the date indicated which truthfully and accurate reflects the event(s) contained therein.

Pursuant to Title 28, United States Code, § 1746, I declare under penalty of perjury that the foregoing, as well as the contents of the attached statement dated June 14, 2004, are true and correct.

Executed on this 11th day of October, 2006.

JUDY G. SUMNER

This letter is in reference to my professional dealings with Larry Thomas.

I met Larry Thomas in May 2003 when he started working for the IT department. At that time, Larry told me that he was hired as the Network Manager for CAVHCS. I later discovered that Larry was not a network specialist but some sort of trainer (I still don't know what his responsibilities were). On numerous occasions, Larry would stop me in the hall and inform me what I needed to be doing with biomedical equipment and how the doctors were complaining about biomed not doing their job. During these conversations, Larry would "adjust" himself. I noticed him adjusting his private parts several times. I made it a point to never be around him alone again.

Several times, Larry repaired biomed equipment computers and after he was finished, I (and my supervisor) would get a call from the department that their biomed equipment is down. One instance is the eye camera in the optometry clinic. Larry took it upon himself to load the Topcon eye camera computer (this is a biomed computer) on the hospital network. The Topcon software program would not launch when the computer was rebooted after Larry repaired it. After several weeks of trying to find out what Larry did to the computer, I finally deleted all the network settings and the computer software worked like it did before Larry "fixed" it. Another occasion is the Muse EKG system in Tuskegee. Larry received a service call on the Muse system, and even though he had been informed that the Muse is biomed's responsibility, he proceeded to work on it. The computer was so messed up that we had to call the vendor in to reformat and reload software, not only in Tuskegee but also in Columbus. The medical center had to pay for the vendor to repair the damage that was done to the Muse. The original problem that Larry received was that the EKG technician didn't have sufficient rights to that computer/software. That is an easy fix that could have been resolved in minutes. Instead, the equipment was rendered completely inoperable for several days.

Larry did set up a committee to meet every week (maybe it was 2X's a week) to discuss any issues that pertained to biomed, radiology, cardiology and information systems. Larry hardly ever showed to these meetings. On several occasions, I was the only one that showed. I informed my supervisor that I would no longer be attending these meetings because they were a waste of time and resources. I refused to have any dealings with Larry without another person being present. He would constantly stop me in the hallway to tell me how to do my job and let me know that he went to my supervisor's boss and informed her I was not qualified for a job opening that I applied for. I feel Larry harassed me and tried to make me look bad professionally. Whenever he would get into a bind, he would email that it was biomed's fault. Larry is very condescending towards me and has tried to intimidate me.

If you need more information, you can contact me at extension 4432.

Judy Sumner                                             June 14, 2004

Attachment D    

-----Original Message-----
**From:** Singh, Himanshu
**Sent:** Wednesday, June 16, 2004 11:55 AM
**To:** Greer, William H. CAVHCS
**Subject:** RE: STATEMENT RE: LARRY THOMAS\CAVHCS EEO
**Importance:** High
**Sensitivity:** Confidential

Mr. Greer,

This is my view on Mr. Thomas who respectively was the Imaging Coordinators at CAVHCS.

As noted many a time, there existed animosity and a non-cooperative working environment with Mr. Thomas and his counterpart.
This was a major issue and hold up in the implementation and advancement of VISTA Imaging/RAD at CAVHCS.

Problems with Mr. Thomas:

- Mr. Thomas biggest problem is his ego, arrogant behavior and lack of respect of others.
- Mr. Thomas, without a doubt, lacks the knowledge base that is required for this position.
- Mr. Thomas training methodology in regards to this job was also questionable.
- Mr. Thomas lacks the vocabulary and speech needed to be in a professional environment, and never showed any signs of improvement.
- Mr. Thomas also lacked the clinical knowledge that the position required.
- Mr. Thomas also at times displays distasteful mannerism. For example "Grabbing his or touching his Private Parts".
- I have before and to this date still question Mr. Thomas' credentials.

Conclusion:
I believe that Mr. Thomas lacked the knowledge base that the position requires. Even after all the guidance and opportunity put forth for him, he never showed any improvement or made an attempt to improve.

Please call me if you need to discuss this matter any further.

**Himanshu Singh, M.D.**
**VISN 7 - Informatics**
**Phone # - 706-733-0188 ext. 1955**
**Cell # - 706-533-4720**

Attachment E 

Name of Employee:  Larry Thomas

**CRITICAL ELEMENT**
CUSTOMER SERVICE/QUALITY OF WORKING RELATIONSHIPS:  ✓ SUCCESSFUL  __UNACCEPTABLE
**Contacts are handled with tact, diplomacy, understanding, support, skill and necessary teamwork to meet the specific needs of customers, both internal and external.**

Displays positive attitude towards service mission and goals. Adheres to, and promotes, CAVHCS Core Values of Trust, Respect, Excellence, Compassion, Courage, Integrity, and Commitment in all contacts. Consistently contributes to the job performance, productivity and satisfaction of others. Positively responds to suggestions for improvement from supervisor or colleagues.

SAFETY:  ✓ SUCCESSFUL  __UNACCEPTABLE
**Care with which work is approached: consideration for safety of patients, visitors and fellow employees; compliance with safety policies.**

Consistently observes safety rules and demonstrates safe work habits and practices consistent with VA/CAVHCS and other applicable policy and regulations. Keeps supervisor informed of any safety issues affecting patients, visitors and staff as they arise.

INFECTION CONTROL:  ✓ SUCCESSFUL  __UNACCEPTABLE
**Correctly and consistently follows infection control guidelines in all settings and at all times. Adheres to infection control guidelines appropriate to the work area assigned and in keeping with general practices of cleanliness.**

Observes guidelines and demonstrates habits and practices consistent with VA/CAVHCS and other applicable policy and regulations. Keeps supervisor informed of any infection control issues affecting patients, visitors and staff as they arise.

ADP SECURITY:  ✓ SUCCESSFUL  __UNACCEPTABLE
**Knowledgeable of confidential matters and follows established controls; maintains the confidentiality of privileged information; maintains security and integrity of computer system through control of passwords and authorized use of access to various internet/intranet sites.**

a.  Observes guidelines and demonstrates habits and practices consistent with VA/CAVHCS and other applicable policy and regulations.

b.  Ensures material or information of a confidential nature is protected from distribution to unauthorized individuals and/or groups.

I acknowledge that I will be rated on these new Performance Standards, effective October 1, 2003, in addition to the current Performance Standards I received at the beginning of this rating period.

_____  10/30/2003        _____  10/30/03
Employee Signature         Date                  Supervisor Signature

**Attachment F**

## CUSTOMER SERVICE AND TEAM SUPPORT

Develops and maintains effective, professional relationships with other VISTA Imaging and medical center staff, veterans, and iividuals outside the agency in performing tasks, exchanging information, and in preventing and resolving problems which inhibit mission accomplishments.

**SUCCESSFUL:** Works effectively with others and actively takes part in projects or activities that cross team, service and organizational boundaries in support of goals and objectives.

**SOURCE FOR MONITORING:** Committee minutes, customer feedback, supervisor review.

Represents the Informatics department locally and externally to the extent that little or no criticism is received as a result of lack of preparation or non-responsiveness. Treats others with courtesy and respect, interacting in a way that promotes a harmonious and cooperative working environment. Gives objective appraisal of other staff's ideas.

**SUCCESSFUL:** Is prepared when meeting with customers so that little or no criticism is received because of lack of preparation or non-responsiveness. Remains cooperative and courteous when dealing with both internal and external customers.

**SOURCE OF MONITORING:** Customer feedback.

Maintains a climate of cooperation and helpfulness within the VISTA Imaging team, Clinical Informatics team, local Information Technology personnel, and coordinates with all departments and Service Lines to ensure that ADP objectives and goals are met. Responses cover all appropriate points and show flexibility in approach to resolving problems. Exercises patience and has realistic expectations in day-to-day operations, specifically in periods of understaffing, changes in priorities, and/or critical deadlines. Actively assists co-workers when workloads become unmanageable or overwhelming.

**SUCCESSFUL:** All VISTA Imaging projects are coordinated with our customers. Customers are notified of changes in ADP objectives. Assists other informatics staff when necessary to meet service line objectives.

**SOURCE FOR MONITORING:** Supervisor review, customer satisfaction surveys, customer complaints.

Ensures Information Technology staff receives training on new equipment, software, and application updates.

**SUCCESSFUL:** Training of Information Technology staff on new equipment, software, and application updates is consistently provided. Two instances or less of not providing training is acceptable.

**SOURCE FOR MONITORING:** Valid staff complaints, training package, supervisor review of training initiatives.

_nsures clinicians, nurses, HAS staff, and other users of VISTA Imaging application receive training on new equipment, software, and application updates.

**SUCCESSFUL:** Training of Imaging service providers, clinicians, nurses, HAS staff, and users of VISTA Imaging application programs is consistently provided. Two instances or less of not providing training is acceptable.

**SOURCE FOR MONITORING:** Valid staff complaints, training package, supervisor review of training initiatives.

## PROGRAM ADMINISTRATION

Coordinates the day-to-day activities of the local VISTA Imaging team.

**SUCCESSFUL:** Teamwork objectives are coordinated to meet the goals and needs of the VA, VISN and the Medical Center. Three exceptions or less of not meeting or setting priorities are acceptable.

**SOURCE FOR MONITORING:** Valid complaints from customers, supervisor reviews.

Prepares problem tracking entries/annotations, other writing assignments and provides workload logs within specified time frames.

**SUCCESSFUL:** Accurately documents within established timelines. Three exceptions or less are acceptable.

**SOURCE FOR MONITORING:** Supervisor review of workload logs and assignments.

Responds in a timely manner to all requests for information, reports, and policies.

**SUCCESSFUL:** Advice is consistently provided without substantive errors. Three exceptions or less are acceptable.

**SOURCE OF MONITORING:** Valid customer complaints and/or customer surveys.

Ensures implementation of new or changed policies/procedures as directed by management within established and reasonable timeframes.

**SUCCESSFUL:** Policies and procedures are implemented within established timeframes.

**SOURCE FOR MONITORING:** Valid complaints from customers, supervisor review.



Provides training and technical guidance to other local VISTA Imaging and Clinical Informatics team members.
SUCCESSFUL: Provides training, directions, useful information and operational guidance. Employees are competent to perform
t s.
SOURCE FOR MONITORING: Customer support logs, supervisor review, training package.

Helps develop short and long-range goals in support of VHA, VISN and Medical Center performance standards.
SUCCESSFUL: Request for information and reports regarding meeting goals and performance measures are provided in a timely
manner.
SOURCE FOR MONITORING: Customer complaints, supervisor review of implementation of goals and performance measures.

## TECHNICAL FUNCTIONS

Technical support is consistent without substantive errors of negative impact.
SUCCESSFUL: Accurate and responsive advice is given in determining causes and corrections to errors/problems. No more than
three instances of not meeting the specific measure are acceptable.
SOURCE FOR MONITORING: Supervisor review, customer satisfaction surveys, valid customer complaints.

Provides timely, accurate responses to questions, written requests and inquiries regarding technical aspects of the VISTA Imaging
program. Assists in planning information technology requirements and other technical evaluation as required. Performs thorough
analysis of systems-related requests and produces professional evaluation for the requester.
SUCCESSFUL: Stays focused on customer needs and is responsive. No more than three instances of not meeting the specific
measure is acceptable.
SOURCE FOR MONITORING: Supervisor review, customer complaints.

Ensures reliability of VISTA Imaging applications. Reacts and advises on problems that may render the system or data unavailable
for full use, reacts promptly and professionally to system or software-related crises, and does not expose system or data to
unwarranted risks.
SUCCESSFUL: VISTA Imaging availability is limited only to instances outside the control of the employee. Assures VISTA
ging patches are current in the Test and Production Systems. No more than three instances of not meeting the specific measure is
a...eptable.
SOURCE FOR MONITORING: Review of system logs, Supervisor review of patch module, review of problem tracking logs,
customer service satisfaction survey.

Ensures VISTA system error logs and VMS Queues are monitored for Application and Device Errors. Ensures that VISTA system
activities are appropriately coordinated and that system optimization procedures are implemented, and that appropriate procedures are
followed to ensure data integrity and data restoration in the event of equipment failure or data corruption.
SUCCESSFUL: The employee will notify and if required work with Hardware staff on correcting printer problems. Device file and
Queues files are current and devices not in use are placed out of service. Users are notified if there is a problem with the users printing
to devices not available. Error logs will be monitored throughout the day. Errors associated with infrastructure hardware will be
corrected and errors associated with application software brought to the attention of the software support staff responsible for the
software application. No more than three instances of not meeting the specific measure is acceptable.
Source for Monitoring: Supervisor review of System and VISTA error logs, and device file. Customer complaints.

Employee is responsible for following nationally and VISN level operational procedures and for developing and implementing site-
specific VISTA operational procedures as needed.
SUCCESSFUL: VISTA Operational Procedures are current and updated as soon as changes in procedures or hardware are made.
Site specific operational procedures are appropriately documented and updated as necessary.
Source for Monitoring: Supervisor review of national, VISN and local VISTA Operating Procedures.

## SYSTEM SECURITY

Ensures that printed and electronic files containing sensitive data are protected consistent with the Privacy Act of 1974 and other
applicable laws, Federal regulations, VA regulations and policy and VHA policy. Ensures sensitive data is released, disclosed,
altered, reproduced or deleted from electronic files on as authorized. Ensures that computers are accessed and access codes are
eleased on as authorized consistent with signed computer access agreements and accomplishment of the medical center mission.
.:nsures that applicable Automated Information Security (AIS) policies are observed.

3

### Name of Employee: <u>Larry Thomas</u>

Due to an administrative clerical error L.Thomas failed to receive a copy of the VISTA Implementation Managers standards.  He was issued a copy of the VISTA Implementation Managers standards on 30 October 2003.  He did receive a copy of the Position Description upon arrival.

Both grammatical and spelling content contained in L.Thomas' electronic communications are inundated with errors to such an extent that L.Thomas must send outbound messages intended for a wide audience to the Clinical Team Leader for revision and proofreading.  L.Thomas' produced training materials initially also contained errors in terms of grammatical and spelling content.  L.Thomas is highly encouraged to correct this issue, as there is an expectation of clear communication both in oral and written format directly associated with his position as the VISTA Imaging Implementation Manager.  Among options open to L.Thomas he may consider joining the CAVHCS Toastmasters organization as well as pursuing an academic course in basic English and composition.

During a recent VISN7 sweep of ADP assets Kazaa was discovered on L.Thomas's laptop.  Larry indicated that this was his son's fault as he had used the asset.  This means either the laptop was left unattended and logged-in or his son is aware of his password and username.  L.Thomas stated that he would better control access to the asset.

As there are concerns regarding his performance and conduct L.Thomas will have monthly review of performance and conduct administered by his supervisor during the remainder of his probationary period.

Effective October 1, 2003, you will be rated on the attached new Performance Standards, in addition to the standards you received at the beginning of this rating period.

_____    10/30/2003    _____    10/30/03
Employee Signature            Date           Supervisor Signature       Date

Comments:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____