IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY D. THOMAS,                          )
                                          )
        Plaintiff,                        )
                                          )
v.                                        )      CIVIL ACTION NO.  2:05cv437-MHT
                                          )
R. JAMES NICHOLSON,                       )
Secretary of the Department of            )
Veterans Affairs,                         )
                                          )
        Defendant.                        )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.  INTRODUCTION

The pro se plaintiff, Larry D. Thomas ("Thomas"), a former employee of the United States Department of Veterans Affairs, brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), alleging that he was discriminated against on the basis of his race (African-American) when he was terminated from his employment and that he was subjected to racial harassment.  He names R. James Nicholson, the Secretary of the Department of Veterans Affairs, as the sole defendant in this case.  Thomas seeks recovery of back pay and reinstatement to his former position as a Vista Imaging Implementation Manager at the Central Alabama Veterans Healthcare System (CAVHCS) in Montgomery, Alabama.

This court has jurisdiction of Thomas' discrimination claims pursuant to the jurisdictional grant in 42 U.S.C. § 2000e-5.  Now pending before the court is the defendant's motion for summary judgment.  The court has carefully reviewed the motion for summary

judgment, the briefs filed in support of and in opposition to the motion, and the supporting and opposing evidentiary materials and concludes that the motion is due to be granted.

## II.  SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant, either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Jeffery v Sarasota White Sox, Inc.,* 64 F.3d 590, 593 (11th Cir. 1995); *Edwards v. Wallace Cmty Coll.,* 49 F.3d 1517, 1521 (11th Cir. 1995).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element of his claims, and on which he bears the burden of proof at trial.  *Id.* To satisfy this burden, the nonmovant cannot rest on the pleadings, but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e).

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law.  *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir. 1987).  It is substantive law that identifies those facts which are material on

motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986); *See also DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir. 1989).

When the court considers a motion for summary judgment, it must refrain from deciding any material factual issues. All the evidence and the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990). *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir. 1983).

## III. FACTS

In 2003, the Department of Veterans Affairs (VA) began preparations to update its computer systems within the Veterans' Integrated Systems Network area 7 (VISN 7), which is comprised of all VA medical facilities within Alabama, Georgia, and South Carolina. (Doc. No. 37, Def's Ex. 2, p. 2.) One of the important events during this process was the installation and implementation of the VISTA Imaging System throughout VISN 7.[1] (*Id.*)

---

[1] In his affidavit, William Greer described the computer system as follows:

> Vista is a computer operating system much like Windows. Vista imaging is a feature of the system which allows for the production of digitally formatted, computer stored images such as x-rays and medical records. As it is computer based, the VISTA system allows medical professionals in one hospital, for example, to view over the system, images taken at another location instantaneously. The system, therefore, allows, amongst other things, two doctors, in two different hospitals, the ability to view at the same time, the same x-ray, without the delay and expense occasioned by reproduction of the film and transmission by some other means such as facsimile or the mails. Given the digital format of the image, each doctor simultaneously and instantaneously with its production, can

3

While planning for the transition to VISTA, CAVHCS officials determined there was a need for a VISTA Imaging Systems Implementation Manager and began advertising for the position.  At some point prior to May 2003, Thomas applied for the position.  Members of a selection panel, including William Greer ("Greer"), the IT Operations manager, Harold Carlisle ("Carlisle"), the acting Chief Information Officer, Ty Beasley ("Beasley"), the Clinical Informatics team leader, and other CAVHCS officials conducted interviews with various applicants, including a telephone interview with Thomas.  (Doc. No. 37, Def's Ex. 4, Beasley's Dep., R. 5.)  After completion of the interview process, Carlisle selected Thomas for the position.  CAVHCS officials agreed that the Government would provide funding for Thomas' relocation to the Montgomery area.

During the long journey from sunny California to his new job in blue-skied Alabama, Thomas stopped in Texas.  On May 15, 2003, he stayed at a hotel in El Paso, Texas. (Doc. No. 1, Attach. No. 3.)  The following evening, he checked into a motel in Marshall, Texas. (*Id.*) Thomas paid for the accommodations in cash and the Government subsequently reimbursed him for his expenses.  (*Id.*)

On May 18, 2003, the VA approved Thomas' career-conditional appointment as an IT Specialist.  (Doc. No. 37, Def's Ex. 1.)  Thomas initially shared an office with Saundra Venne ("Venne"), the Vista Systems Manager.[2]  Venne and Thomas, however, did not develop a good

---

view the same x-ray in its original state.

(Doc. No. 37, Def's Ex. 2, p. 3.)

[2] The Vista Systems Manager is responsible for the installation and maintenance of all hardware and software and the Vista Implementation Manager is responsible for training and education of end users.  (Doc.

4

working relationship with each other. (Doc. No. 37, Def's Ex. 2, p. 9; Def's Ex. 3, p. 6.) At one point, Venne changed Thomas' software profile, causing Thomas difficulties when attempting to implement various computer systems throughout the VISN 7. (Doc. No. 31, pp. 4-5.) On another occasion, Venne reported to management that Thomas incorrectly re-booted a system, resulting in the loss of patient information.[3] (*Id*.) After receiving various complaints about Thomas from Venne, Carlisle restricted Thomas' network access and began requiring that Thomas gain permission and codes from management before performing each task. (Doc. No. 31, p. 4.)

The animosity between Thomas and Venne continued to grow. (Def's Ex. 2, Attach. E.) For example, Venne filed a complaint of sexual harassment against Thomas, alleging that he fondled himself in her presence. (Def's Ex. 2, p. 9; Doc. No. 45, pp. 4-5.) CAVHCS conducted an internal mediation with Venne and Thomas.[4] During the mediation process, Thomas agreed that he would relocate to the clinical informatics training room. (*Id*., pp. 9-10.)

Greer conducted a mid-term evaluation of Thomas in October 2003. (Def's Ex. 2, Attach. F.) After completion of the evaluation, Greer provided Thomas a memorandum, which specified as follows:

> Due to an administrative clerical error L. Thomas failed to

No. 37, Def's Ex. 2, p. 3.)

[3] Thomas asserts that Venne's allegations were false and that another employee decided to re-boot the computer system.

[4] Thomas maintains that the allegations were untrue and that, during mediation, Venne's allegations against him "went from fondling hi[m]self to speaking to her in a condescending tone." (Doc. No. 45, p. 5.)

receive a copy of the VISTA Implementation Managers standards. He was issued a copy of the VISTA Implementation Managers standards on 30 October 2003. He did receive a copy of the Position Description upon arrival.

Both grammatical and spelling content contained in L. Thomas' electronic communications are inundated with errors to such an extent that L. Thomas must send outbound messages intended for a wide audience to the Clinical Team Leader for revision and proofreading. L. Thomas' produced training materials initially also contained errors in terms of grammatical and spelling content. L. Thomas is highly encouraged to correct this issue, as there is an expectation of clear communication both in oral and written format directly associated with his position as the VISTA Imaging Implementation Manager. Among options open to L. Thomas he may consider joining the CAVHCS Toastmasters organization as well as pursuing an academic course in basic English and composition.

During a recent VISN 7 sweep of ADP assets Kazaa was discovered on L. Thomas' laptop. Larry indicated that this was his son's fault as he had used the asset. This means either the laptop was left unattended and logged-in or his son is aware of his password and username. L. Thomas stated that he would better control access to the asset.

As there are concerns regarding his performance and conduct L. Thomas will have monthly review of performance and conduct administered by his supervisor during the remainder of his probationary period.

Effective October 1, 2003, you will be rated on the attached new Performance Standards, in addition to the standards you received at the beginning of this rating period.

(Def's Ex. 2, Attach. E.)

After Thomas' mid-term evaluation, Greer continued to receive complaints about

Thomas' work product and inability to follow established policies and procedures. (Def's Ex.

2, Greer's Declaration, p. 8; Def's Ex. 5, p. 3.) At some point shortly after April 20, 2004, Dr.

Judith St. Onge[5] complained to Greer as follows:

> During the morning of April 20, I was approached in the hallway by a gentleman who identified himself as Larry Thomas, who stated that he had been trying to see me but had been unsuccessful. I had my calendar with me, so gave him an appointment for 2PM. (Note: As soon as I returned to the office, I checked with Ms. Oda, Ms. Moss, and Ms. Baldwin who denied that he had tried to make an appointment with me.)
>
> Mr. Thomas arrived at 2PM. He stated that he was there to inform me that the facility needed many digital cameras, docking stations and tripods so that the nurses and clerks could take pictures of the patients, because this is a requirement for JCAHO (note: it is NOT a JCAHO requirement). He was unclear of how many he felt we would need, but at one point 22 cameras for just one service line (Mental Health) was mentioned. I asked Mr. Thomas if he had obtained approval of the AD of Patient care and the Chief, HAS for their staff to be taking pictures. He said that he didn't need this approval because he had been out on the units telling staff that they need to start making space for these cameras and accessories because he had determined this was necessary. I emphatically told him that I personally did not agree with this approach, but that my agreement, or his, were not the issue. I reminded hm that we have a council structure, as well as an organizational chain of command that would make such recommendations. I asked him not to go out and start informing staff that they would be doing this, or estimating equipment purchases in this way. Mr. Thomas said that he does not get along with the Chief of HAS and that he didn't see why he needed to work with other leaders because he knew what was needed and that it was his job to say what was needed and our job to do it. Again, after lengthy explanation of our council structure and our chain of command, I encouraged him to work through appropriate channels.

---

[5] Between May 18, 2003 through May 18, 2004, Dr. Judith St. Onge was the Associate Director for Patient Care Services and later the Acting Associate Director for Operations. (Doc. No. 37, Def's Ex. 5.)

At that point Mr. Thomas changed the subject to discuss his perception that we need a scanning policy. I told Mr. Thomas that I had seen a scanning policy and that I recalled it was one that was carefully designed to centralize scanning to assure that we did not miss all the steps of processing certain operations such as consults and bills from outside providers. He again disagreed and felt that any attempt on the part of CAVHCS management to handle situations differently from his view was substandard. Again, it was clear to me that Mr. Thomas was not working through appropriate channels at this facility and was not willing to do so. I did agree to set up a meeting if I was wrong and there was no scanning policy. (Note: Subsequent to the meeting, I checked and the scanning policy that I had recalled is in force. Additionally, Mr. Beasley assured me that scanning issues are being carefully tracked through the Information Mgmt Council).

During this meeting, Mr. Thomas was very personable and friendly. We chatted about several other issues, such as our children. But on the issues related to Central Alabama, it was clear that he was not conceptualizing needs or processes of this facility, and was spending a great deal of time working against our existing processes.

(Doc. No. 37, Def's Ex. 5, p. 4.)

On or around May 7, 2004, Dr. St. Onge informed Greer that Thomas had caused confusion among the nurses within her department. Specifically, Dr. St. Onge complained as follows:

. . . It appears that Mr. Thomas had been out on the units telling certain RNs and LPNs that they could no longer enter certain orders into our computer system. The orders they had been entering were approved by Nursing Leadership and established as protocols by the Executive Committee of the Medical Staff. Mr. Thomas had decided that this was not acceptable, and had notified Ms. McLean that it was to stop. Mr. Holt and Ms. McLean thought there were going to have to hire a physician or nurse practitioner to complete the work according

8

to Mr. Thomas' specifications.

     I was shocked and dismayed at this blatant example of a technician dictating clinical practice. I told this to Mr. Thomas, and reference our meeting of 20 April in which I had clearly spelled out to him the mechanisms and chain of command for making policy decisions. He disagreed and began arguing. I called Mr. Ty Beasley, who is head of Clinical Informatics, and asked him to join us. When Mr. Beasley arrived, he described the issue and related that there were several ways that it could be resolved. In Mr. Beasley's presence I again reinforced that our councils and managerial staff are available to work closely to assure that IT solutions mirror clinical needs. I was very clear that CAVHCS cannot tolerate IT technicians dictating clinical practice and medical protocols.

(*Id.*, p. 6.)

     Prior to Thomas' termination, Greer learned that several other CAVHCS employees were dissatisfied with Thomas. (Def's Ex. 2, Greer's Declaration, p. 8.) For instance, the hardware operations manager reported that Thomas had failed to follow established procedures for requesting hardware and reporting equipment failures and that he "was involving himself in matters outside of his area of responsibility." (Def's Ex. 2, Declaration of Mark Kuehndorf, Attach. A, p. 7.) On another occasion, William Piper ("Piper"), a CAVHCS supervisory biomedical engineer, reported that, although he informed Thomas that he should not work on medical devices, Thomas "created trouble with the Colombus Clinic Eye Camera and then . . . left without notifying the clinic and/or Biomedical Section," forcing "the Biomedical Section . . . to reinstall software to correct the problem." (Def's Ex. 2, Piper's Declaration, Attach. B, p. 12.) Piper also reported that Thomas incorrectly advised the Cardio Respiratory Section that an upgrade to "their Holter system to work with the

MUSE system to communicate with VISTA" was not possible and that they should "cancel the purchase order and make another upgrade request." (*Id*.) Piper advised that, due to Thomas' misinformation, the Cardio Respiratory Section lost $14,000 for an upgrade which would have provided the necessary system communication with VISTA. (*Id*.)

In addition, Beasley, the CAVHCS clinical informatics team leader, reported that Thomas "often struggled with not being able to form up a plan and execute a plan successfully," that "[t]here were often significant mistakes in his oral and written communications," that he "did not retain a clear understanding of organizational structure," that he "did not consistently provide training records to [the] education recorder," that he "did not learn well from internal training on steps needed to set up the system for Vista Imaging and often relied on others to perform these steps," and that he "did not read his Vista mail messages and therefore missed a lot of important communications about software patches and package announcements." (Def's Ex. 2, Beasley's Declaration, Attach. C, pp. 13-14.) Beasley also indicated that Thomas' "messages were often poorly constructed, often words were misspelled, [and his] sentence structure was not good" and that his training materials "needed to be corrected before they were ready for distribution to the trainees." (Def's Ex. 4, Beasley's Dep., R. 20, 22.) Judy Sumner ("Sumner"), a biomedical equipment technician, also reported that Thomas "received a service call on the Muse system [in Tuskegee], and even though he had been informed that the Muse is biomed's responsibility, he proceeded to work on it," thereby rendering the "equipment ... completely inoperable for several days." (Sumner's Declaration, Attach. D, p. 8.)

10

On May 14, 2004, Greer recommended to Linda King ("King"), the Chief of Human Resources Management, that Thomas' employment be terminated. That same day, King provided a memorandum to Thomas, stating that Thomas' employment was terminated due to the following:

> The Manager, Informatics, has recommended that you be terminated from your position for failure to qualify during your probationary/trial period. Your discharge is due to your unsuitability as demonstrated by your apparent lack of necessary balance of skills to successfully perform effectively within this position. Your performance with regard to system security, program administration, technical functions, customer service, and team approach was substandard. Your interpersonal effectiveness with regard to communication, competency as a trainer, and functional ability to participate as a member on a diverse team environment was deficient which strained professional relationships across the continuum of service lines.

(Doc. No. 37, Def's Ex. 32.)

On June 1, 2004, Thomas contacted the VA Office of Resolution Management. (Doc. No. 37, Def's Ex. 6, p. 1.) The following day, Thomas spoke with an EEO counselor, asserting that he "feels he was discriminated against based upon race (Black), when on 5/14/2004, he was terminated."[6] (*Id.*, p. 2) On June 24, 2004, the EEO counselor sent a report

---

[6] Specifically, the EEO counselor noted the following:

> Mr. Thomas claims that on May 14, 2004, after working for 361 days as the Vista Implementation Manager. Mr. Thomas contends Mr. Greer told him he was being terminated because his performance over the past year had become apparent that he lacks the necessary skills to perform the position effectively. Mr. Thomas also contends [that] Mr. Greer did not discuss any issues regarding his performance prior to making a decision to terminate him.

(Doc. No. 37, Def's Ex. 6, p. 2.)

to Thomas, indicating that an informal investigation did not resolve the problem.  (*Id.*, p. 3.)

On July 6, 2004, Thomas filed a formal complaint of employment discrimination, asserting

that he was discriminated based on race because (1) he was "charge[d] with allegations

without senior management looking into the matter, (2) Greer and Harold question[ed] if [his]

certifications were real," (3) he was not given an office and he used a folding table as a desk

during the first six months of his employment, and (4) Dr. St. Onge's allegations are false and

were provided to him two days after his termination.  (Def's Ex. 8.)  On August 25, 2004, the

VA Office of Resolution Management informed Thomas that his claims of racial harassment

would not be considered because he did not assert those claims during the informal

investigative process.  (Def's Ex. 9.)  Following an investigation, the VA Office of

Employment Discrimination Complaint Adjudication entered its final agency decision,

concluding that Thomas failed to establish by a preponderance of the evidence that he was

discriminated against as alleged in his complaint.  (Def's Ex. 10, p. 9.)  Thomas filed this

federal lawsuit on May 10, 2005.  (Doc. No. 1.)

## IV.  PLAINTIFF'S CLAIMS

Thomas claims that he was terminated from his position as a VISTA Imaging Systems

Implementation Manager on the basis of his race.  Specifically, Thomas asserts that the

defendant "set him up to fail" by failing to provide him a job description or his own office,

altering his computer profile, and failing to give him appropriate permission to perform his

duties.  (Doc. No. 31, pp. 4-5.)

In addition, Thomas contends that the defendants treated him differently from

12

Caucasian employees and subjected him to racial harassment throughout his employment. He specifically asserts that he was subjected to harassment because (1) his supervisor was a pharmacist, (2) Carlisle "stripped him of [his] administrative duties, even after finding out the allegation was false," (3) he was the "only GS-12 that was never given an office," (4) his six-month evaluation was "nothing more than lies" and he was not provided a job description, (5) he was not on probation at the time of his termination, (6) he was appointed a supervisor to "micro-manage" his performance, (7) he was not given appropriate permission to perform his duties, (8) his computer profile was set up by Venne instead of the software group, (9) Carlisle restricted his network access after Venne falsely accused him of rebooting the servers and losing patient information, (10) Carlisle and Greer questioned his credentials and requested that he obtain proof of his certifications, (11) Carlisle and Greer held him accountable for the VISTA Imaging System Manager's duties and imaging system problems when the national trainers initially visited the site, (12) Greer pressured him to fix a system problem even though he did not have permission to perform the task, (13) he was not provided a "proper job standard" prior to his six-month evaluation, and (14) Venne filed a sexual harassment case against him and set up his account "so that [he] would fail at his job." (Doc. No. 31, pp. 2, 4-6.) Thomas asserts that Caucasian managers and employees were not treated in this manner.

## V. DISCUSSION

The court could summarily grant the defendant's motion for summary judgment because Thomas' response (Doc. No. 45), submitted in opposition to the motion, is neither signed nor sworn. Moreover, the conclusory nature of Thomas' response is insufficient to

create genuine issues of material facts to preclude summary judgment. The response does not "set forth facts as would be admissible in evidence" and does not "show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Unfortunately for Thomas, it is not the court's function to distill every generality into a cogent, adversarial argument. In response to the defendant's motion for summary judgment, Thomas has failed to state with any coherent degree of specificity why the motion should be denied. However, out of an abundance of caution, the court will address the specific arguments presented by the parties.

### A.    Exhaustion of Remedies

The defendant argues that Thomas' racial harassment claims, including his differential-treatment claims, are due to be dismissed because he failed to exhaust his administrative remedies under Title VII. Specifically, the defendant asserts that Thomas failed to assert his racial harassment claims to the EEO counselor prior to filing his formal complaint to the VA Office of Resolution Management. In addition, the defendant maintains that Thomas' harassment claims are untimely because he did not raise these claims to an EEO counselor within 45 days of the alleged discriminatory events.

Thomas does not dispute that he failed to present his harassment claims to the EEO counselor during the informal investigative process. A federal employee must timely exhaust administrative remedies before filing an employment discrimination suit under Title VII. *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832-33 (1976). Specifically, a federal employee must undergo a two-step process to exhaust his administrative remedies: (1) informal

counseling with an EEO counselor within 45 days of the challenged employment act, and (2) the filing of a formal complaint with the agency or department within 15 days after the EEO counselor has issued a notice of final interview. 29 C.F.R. §§ 1614.105 and 1614.106. Once the defendant raises the issue of timeliness, the plaintiff bears the burden of proving that any untimeliness is excused by an equitable exception, such as waiver, estoppel, or the continuing violation doctrine. *See Malone v. K-Mart Corp.*, 51 F.Supp.2d 1287, 1300 (M.D. Ala. 1999) (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 256 (1980)); *Howell v. Dep't of the Army*, 975 F.Supp 1293, 1300 (M.D. Ala. 1997).

In this case, Thomas contacted an EEO counselor on June 2, 2004, asserting that the defendant discriminated against him based upon his race when he was terminated during a probationary period. (Doc. No. 37, Def's Ex. 6, p. 2-3.) During the informal interview, Thomas was informed that "any claims brought to an EEO counselor that occurred beyond the 45-day period for contacting an EEO counselor might be dismissed because of untimely filing." (*Id.*, p. 3.) On June 28, 2007, the EEO counselor also sent Thomas a "notice of right to file a discrimination complaint," in which the counselor advised that Thomas' formal complaint should be limited to events discussed with him during the informal process and that, "if there are any events that you have not discussed with [the EEO counselor], please do so immediately." (Def's Ex. 7.) Thus, it is clear that Thomas was provided notice that any claims not presented to the EEO counselor were subject to dismissal.

The next week, Thomas filed a formal complaint of employment discrimination, asserting a wrongful termination claim, as well as four additional claims. Specifically,

Thomas asserted the following harassment claims: (1) he was "charge[d] with allegations without senior management looking into the matter"; (2) Greer and Harold question[ed] if [his] certifications were real"; (3) he was not given an office and was provided a folding table as a desk during the first six months of his employment; and (4) Dr. St. Onge's allegations against him, which were provided to him two days after his termination, are false. (Def's Ex. 8.) On April 25, 2005, the Office of Employment Discrimination Complaint Adjudication ("the Office") entered a final agency decision, concluding that Thomas' "four part claim relating to alleged harassment based on race" should be dismissed because Thomas failed to discuss the matter with an EEO counselor within 45 days of the discriminatory event. (Def's Ex. 10, p.2.) Thomas does not dispute that he waited until July 6, 2004, to raise these harassment claims to the VA Office of Resolution Management. (Doc. No. 37, Def's Ex. 8.) Thus, Thomas' Title VII claims concerning the lack of investigation by senior management, the validity of his certifications, the use of an office, and Dr. St. Onge's allegations were submitted after expiration of the 45-day period.

In addition, the undisputed evidence demonstrates that Thomas did not present any of his harassment claims to the EEO counselor at any point during the informal proceedings. Moreover, it is clear that several of Thomas' claims have been raised for the first time in this federal lawsuit. Thomas did not merely miss a deadline. Rather, with the exception of his wrongful termination claim, Thomas failed to exhaust his administrative remedies concerning all of the alleged discriminatory acts occurring before the date of his contact with an EEO counselor.

16

More importantly, Thomas makes no legal argument and provides no analysis in his response to the defendant's motion for summary judgment with respect to the timeliness of his harassment claims. He does not point to or otherwise provide the court with any evidence challenging the exhaustion and timeliness issues. Although factual inferences must be viewed in a light most favorable to the moving party, and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing a genuine issue of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). *Cf. Hithon v. Tyson Foods, Inc.*, 144 Fed.Appx. 795, 799 (11th Cir. 2005) (Because the plaintiff provided no legal argument or analysis in her brief regarding the timeliness of her claims, the court deemed the plaintiff's § 1981 and Title VII claims abandoned on appeal and concluded that the claims were time-barred.). Thus, Thomas has failed to demonstrate a genuine issue of material fact regarding the exhaustion and timeliness of his discrimination claims. The court finds that Thomas has failed to show cause for failing to report the alleged discrimination within 45 days of the alleged acts. *See* 29 U.S.C. § 1614.105(a)(2). While the court recognizes that the 45 day filing period may be subject to waiver, tolling, or estoppel under certain circumstances, *see Malone*, *supra*, it is clear that equitable principles are not applicable in this case. This court therefore concludes that all of Thomas' discrimination claims, with the exception of his discriminatory discharge claim, are time-barred. *See Thompson v. West*, 883 F.Supp. 1502, 1508 (M.D. Ala. 1995). Consequently, the defendant's motion for summary judgment with respect to all of Thomas' untimely claims should be granted.

### B.  The Wrongful Termination Claim

Title VII prohibits discrimination on the basis of race, color, religious, sex, or national origin in a variety of employment practices.  *See Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995).  In an employment discrimination case, the plaintiff bears the ultimate burden of proving intentional discrimination. *Texas Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  To defeat the defendant's motion for summary judgment, Thomas must establish a prima facie case of discrimination by one of three generally accepted methods: (1) presenting direct evidence of discriminatory intent; (2) presenting evidence to satisfy the four-part circumstantial evidence test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or (3) presenting statistical proof.  *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).  Thomas has not presented any direct evidence of discrimination nor does he rely on statistical evidence to support his discrimination claims. Thus, the court will discuss whether Thomas has established circumstantial evidence of discrimination.

The court construes Thomas' assertion that his termination was racially motivated as a discriminatory discharge claim.  The Supreme Court in *McDonnell Douglas, supra,* created the now familiar framework for the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination. *See Nix v. WCLY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  To establish a prima facie case of wrongful discharge, a plaintiff must prove that (1) he belongs to a protected class; (2) he was discharged; (3) he was replaced by an individual outside the protected class; and (4) he was

18

qualified for the position held.  *Coutu v. Martin County Bd. of County Comm'rs*, 47 F. 3d

1068, 1073 (11th Cir. 1995); *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989).  If Thomas

can establish a prima facie case, then the burden shifts to the defendant to produce a

legitimate, nondiscriminatory reason for his termination. *McDonnell-Douglas*, 411 U.S. at

802-04.  If the defendant meets his burden of production, then Thomas must present

substantial evidence that the defendant's justification for his termination is pretextual. *Id.*

Proving a prima facie case is not onerous; it requires only that the plaintiff present

sufficient evidence to permit an inference of discrimination.  *Burdine*, 450 U.S. at 253-54.

The defendant concedes that Thomas is African-American, that he was terminated from his

position as a Vista Implementation Manager, that he was qualified for the position,[7] and that

he was replaced by a Caucasian man.  (Doc. No. 37, p. 19.)  Thus, Thomas has met his burden

of establishing a prima facie case of discrimination.

Under the second prong of the *McDonnell Douglas* test, the burden next shifts to the

defendant to present a legitimate, non-discriminatory reason for Thomas' termination.

*McDonnell Douglas*, 411 U.S. at 802.  The Eleventh Circuit holds that "[t]o satisfy this

intermediate burden, the employer need only produce admissible evidence which would allow

the trier of fact rationally to conclude that the employment decision had not been motivated

by discriminatory animus." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir.

1997).  "'The defendant need not persuade the court that it was actually motivated by the

---

[7] The defendant specifically concedes that, "for purposes of this motion, and this motion alone, [Thomas] was qualified for the position for which he was hired."  (Doc. No. 37, p. 19.)

proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'"  *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55).  This intermediate burden is "exceedingly light."  *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

The defendant contends that Thomas was terminated because he "could not ... successfully perform the functions of the position due to a lack of skills in several areas." (Doc. No. 37, p. 20.)  Specifically, the defendant maintains that Thomas was terminated due to his poor communication skills, both oral and written, his lack of a "mastery of basic computer skills and concepts," and his failure to "adhere to the policies and procedures of CAVHCS."  (*Id.*)  Unsatisfactory work performance is a legitimate, non-discriminatory reason for terminating an employee.  *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  Therefore, the court concludes that the defendant has offered a legitimate, non-discriminatory reason for Thomas' termination.

Having determined that the defendant presented evidence of a legitimate, non-discriminatory reason for Thomas' termination, the court now turns to the third prong of the *McDonnell Douglas* test.  *McDonnell Douglas*, 411 U.S. at 802.  Thomas must establish that the defendant's justification for his termination was a pretext for discrimination based on his race.  Construing the evidence in the light most favorable to the plaintiff, the court concludes that Thomas has failed to present substantive evidence that the defendant's reason for terminating him was a pretext for racial discrimination.

In evaluating a plaintiff's evidence of pretext, the court is not required to agree with

the employer's proffered reasons for discharge. This Circuit has consistently held that federal courts, in resolving these types of claims, do not review the accuracy of an employer's decision to terminate a plaintiff's employment. *See e.g., Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1321 n.16 (11th Cir. 1998), *quoting Nix,* 738 F.2d at 1187 ("Title VII is not a shield against harsh treatment at the workplace. . . The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). Instead, the crucial question is whether the employer was motivated by an improper discriminatory bias. *See, e.g., Standard v. A.B.E.L. Serv., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998); *Combs*, 106 F.3d at 1538.

As previously discussed, Thomas' pleadings are not a model of clarity. On October 31, 2006, Thomas submitted a "Memorandum in Support of Plaintiff Motion to Proceed to Trail [*sic*] or in the alternative, Motion for Summary Judgment."[8] (Doc. No. 45.) The court construes Thomas' submission as a response to the defendant's motion for summary judgment. In his response, Thomas initially argues that the defendant's articulated reasons for terminating him should not be believed because, during the last six months of his employment, he "was not given notice in warning" that he had not met management's expectations. (*Id.*, p. 2.) Specifically, Thomas claims that the defendant should have provided him an official warning because he was a "non-probationary" employee at the time of his

---

[8]Attached to this document are letters from physicians and other persons with whom Thomas worked at the medical center all attesting to his knowledge, skills and abilities with computers and computer training. None of these unsworn materials are sufficient to create a genuine issue of material fact about whether Thomas' discharge was racially motivated.

termination on May 14, 2004. Thomas maintains that his employment began on May 15, 2003, when the defendant agreed to reimburse him for his moving expenses from California to Alabama. Although Thomas may have assumed that nothing but blue skies were coming his way and that he was somehow already employed by the VA during his move to Montgomery, Thomas' argument is clouded by his own evidentiary materials which clearly indicate that his employment became effective on May 18, 2003. (Doc. No. 53-2.) Thus, Thomas' termination on May 14, 2004, occurred while he was a probationary employee. Thomas, therefore, was not entitled to specific notice of his shortcomings or other requirements of due process at any time prior to his termination. More importantly, it is undisputed that the defendant provided Thomas with a general job description upon his arrival in May 2003 and that he was given a more specific description of the expectations for the position and a memorandum detailing areas which needed improvement during his six-month evaluation on October 2003. Although Thomas argues that he did not receive any official warnings or other notices after his six-month evaluation, he fails to present any evidence demonstrating that the defendant's failure to give him additional warnings was motivated by racial animus. An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. *See Nix*, *supra*. Consequently, Thomas' argument that he did not receive official notice or a warning prior to his discharge fails to establish pretext.

Next, Thomas contends that the defendant's assertion that he failed to meet expectations is merely a pretext for discrimination because "they set [him] up to fail before

[he] got started." (Doc. No. 45, p. 2.)  He specifically alleges that, when he arrived at work and management realized that he was black, members of management "allowed Mrs. Venne to setup [his] admin account, and they knew she did not give [him] the security keys to do his job." (*Id.*)  Thomas also alleges that he "always had to ask for security keys to do [his] job." (*Id.*, p. 4-5.)  However, it is undisputed that, after receiving complaints about Thomas' work performance, Carlisle indicated that he decided to "pull [Thomas'] privileges until [Thomas became] more familiar with the system." (*Id.*, p. 3.)  Although Thomas argues that the complaints from employees and customers were based on erroneous facts, he fails to point to any evidence demonstrating that the defendant's decision to protect its sensitive computer programs after receiving complaints about him was in any way motivated by an improper discriminatory bias. *See Nix*, *supra*.

Thomas also asserts that management "kept him out of the loop"in an effort to "try and keep him away from the powers that be." (Doc. No. 45, p. 7.)  Specifically, he maintains that he "felt like [he] should be part of several committees to better perform [his] job." (*Id.*) It is clear that Thomas' mere speculation that management failed to place him on a variety of committees in order to prevent him from performing his job effectively does not establish pretext.

Thomas fails to present or direct the court to any evidence establishing that the decision to terminate him was racially motivated.  At best, Thomas presents nothing more than unsubstantiated allegations and conclusory statements in opposition to the defendant's motion for summary judgment with respect to the discriminatory discharge claim. "[U]nsubstantiated

assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). *See, e.g.*, *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value). *See also Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976) (conclusory statements, unsubstantiated by facts in the record, will normally be insufficient to defeat a motion for summary judgment).[9] This court therefore concludes that the defendant's motion for summary judgment with respect to Thomas' discriminatory discharge claim should be granted.

## VI. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion for summary judgment be GRANTED and that this case be DISMISSED with prejudice.

It is further the RECOMMENDATION of the Magistrate Judge that the costs of this proceedings be taxed against the plaintiff.

It is further

ORDERED that the parties are DIRECTED to file any objections to the **on or before May 21, 2007** . Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a

---

[9]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 7th day of May, 2007.


_____/s/Charles S. Coody_____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE